569 A.2d 674

**STATE of Maryland**

v.

**Michael James KRAMER.**

**No. 73, Sept. Term, 1989.**

Court of Appeals of Maryland.

Feb. 13, 1990.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for petitioner.

Julia Doyle Bernhardt, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., HOWARD S. CHASANOW, Judge * Specially Assigned and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned, JJ.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

The life of Sue Wharton Miller was snuffed out in an automobile accident on a rural road in Cecil County, Maryland, shortly before midnight on December 5, 1987. The accident was investigated by the Maryland State Police. The investigation led to a criminal information which presented that Michael James Kramer committed the crime of manslaughter of Mrs. Miller by automobile (first count), three traffic violations related thereto (counts two, three, and four—reckless driving, negligent driving, and passing in a no-passing zone), and the offense of driving a motor vehicle not covered by required security (fifth count). The pretrial maneuvering focused on a motion by Kramer to

---

* Howard S. Chasanow, a judge of the Seventh Judicial Circuit, was specially assigned to the Court of Appeals at the time the case was argued. He was sworn in as a judge of the Court on 17 January 1990.

sever the fifth count (the "insurance charge") from the other four counts. The motion was denied by the judge presiding at the hearing on the motion in the Circuit Court for Cecil County. The trial proceeded before a jury on all five counts. In his instructions, the trial judge told the jury: "If the verdict is guilty as to Count 1, then you would ignore Counts 2, 3 and 4 because they would be included in it. Just go to Count 5, which is the insurance one." The jury returned a verdict of guilty of manslaughter by motor vehicle as to count one and the judge told the court clerk: "Go right to Count 5." The jury returned a verdict of guilty as to "Count 5, driving a motor vehicle without security insurance...." Sentences were imposed. Kramer appealed.

The Court of Special Appeals reversed the judgments and remanded the case for new trials. *Kramer v. State,* No. 945, September Term, 1988, filed 26 April 1989, unreported. The court concluded that Kramer "suffered significant prejudice when the [trial] court refused to sever the two charges against him." Slip opinion at 2. Although we disagree in part with the judgment of the Court of Special Appeals, we agree with its conclusion regarding prejudicial joinder. In reaching that conclusion, however, we travel a different path than that followed by the Court of Special Appeals.

I

■ Maryland Code (1977, 1987 Repl.Vol.), Title 17 of the Transportation Article (TR) concerns "required security." Subsection (a) of TR § 17–107 provided that

[a] person who has knowledge that a motor vehicle is not covered by the required security may not:

(1) Drive the vehicle.... [1]

---

1. Acts 1988, ch. 787, effective July 1, 1988
   substituted "knows or has reason to know" for "has knowledge" in the introductory language of subsection (a), inserted present subsec-

Section 17–101 states that " 'required security' means security in the form and providing for the minimum benefits required under this subtitle [Subtitle I. General Security Provisions] or any other provisions of the Maryland Vehicle Law." Section 17–103 prescribes, subject to two limited exceptions set out in § 17–102, the form and minimum benefits of security. Section 17–104 declares:

(a) *In general.*—The [Motor Vehicle] Administration may not issue or transfer the registration of a motor vehicle unless the owner or prospective owner of the vehicle furnishes evidence satisfactory to the Administration that the required security is in effect.

(b) *Owner to maintain required security.*—The owner of *a motor vehicle that is required to be registered in this State* shall maintain the required security for the vehicle during the registration period. [Emphasis added.]

It is perfectly clear that the "required security" prescribed by Title 17 must be maintained only on "a motor vehicle that is required to be registered in [Maryland]." *Nationwide Mutual Ins. Co. v. USF & G,* 314 Md. 131, 135–136, 550 A.2d 69 (1988). Were it otherwise, for example, the operator of a motor vehicle registered in a sister state which did not require compulsory insurance, or which required less security than Maryland, would have to stop at the Maryland border and obtain the "required security"

---

tion (b), and redesignated former subsection (b) as present subsection (c).

The new subsection (b) reads:

*Evidence of violation of subsection (a).*—(1) In any prosecution under subsection (a) of this section the introduction of the official records of the Motor Vehicle Administration showing the absence of a record that the vehicle is covered by the security required under § 17–104 of this subtitle shall be prima facie evidence that a person knows or has reason to know that a motor vehicle is not covered by the required security.

(2) The introduction of evidence of the records of the Administration may not limit the introduction of other evidence bearing upon whether the vehicle was covered by the required security.

Former subsection (b), present subsection (c), deals with the defense of sovereign immunity. *See* 1989 Cum.Supp. to the Transportation Article.

before entering Maryland. If he proceeded into Maryland without the "required security," he would be a misdemeanant subject to punishment.

Section 13–402.1 of the Transportation Article concerns "vehicles of non-residents not subject to registration." It reads:

(a) *In general.*—A nonresident may drive or permit the driving of a foreign vehicle in this State, without registering the vehicle in this State, if:

(1) At all times while driven in this State, the vehicle:

(i) Is registered in and displays current registration plates issued for it in the owner's place of residence; and

(ii) Carries as provided in § 13–409(a) of this subtitle,[2] a current registration card issued for it in the owner's place of residence; and

(2) Except as otherwise provided in this section ..., the vehicle is not:

(i) Used for transporting persons for hire, compensation, or profit;

(ii) Regularly operated in carrying on business in this State;

(iii) Designed, used, or maintained primarily for the transportation of property; or

(iv) In the custody of any resident for more than 30 days during any registration year.

The fifth count of the information was drawn under TR § 17–107(a). It presented that Kramer

unlawfully did drive a vehicle which was not covered by required security while having knowledge that said vehicle was not covered by required security.

At the time the information was filed, the authorities knew that Kramer was a resident of Pennsylvania, that the

---

**2.** Section 13–409(a) of the Transportation Article of the Maryland Code requires

[a]n individual who is driving or in control of a vehicle shall carry a registration card in the vehicle to which the registration card refers.

automobile which was the subject of the insurance charge was owned by Kramer, that it was registered in Pennsylvania, that it displayed current Pennsylvania license plates and that it was not within the restrictions set out in TR § 13–402.1(a)(2). There is no suggestion that Kramer did not carry a current registration card in the vehicle to which the card referred which was issued in Kramer's place of residence; he was not charged with a violation of TR § 13–409(a). *See* note 2, *supra.* At the time the automobile was registered and the license plates issued, the Pennsylvania licensing authority was obviously satisfied that the security required in that state had been met. Neither Kramer's operator's license nor the registration of the vehicle had been revoked and the license tags had not been recalled.[3] Kramer was in compliance with the Maryland law granting him, as a nonresident, the privilege to drive his vehicle in Maryland. Therefore, at the time of the accident, he was not committing an offense criminally proscribed by Maryland law when he drove his automobile in Maryland. In short, the charge in the fifth count of the information did not constitute a crime; the "required security" did not apply to Kramer or to his vehicle.

"Basic to our theory of justice is the principle that there can be no punishment for harmful conduct unless it was so provided by some law in existence at the time." Clark & Marshall, *A treatise on the Law of Crimes* 11 (7th ed. 1967). This is expressed in the maxim *nullum crimen sine lege, nulla poena sine lege* (no crime or punishment without law). W. LaFave & A. Scott, *Criminal Law* 8 (1986). "[T]he maxim cuts deeply into the judicial process...." R. Perkins & R. Boyce, *Criminal Law* § 106 (3d ed. 1982).

---

**3.** The Pennsylvania Financial Responsibility Law established a hybrid system between a mandatory and voluntary insurance system. All applications for motor vehicle registration must be accompanied by a certification of financial responsibility. Sanction for failing to meet financial responsibility requirements is loss of motor vehicle operating privileges, suspension of motor vehicle registration, or both. *See* Pa.Cons.Stat.Ann. title 75, §§ 1786, 1305, 1309 (Purdon 1977, 1989 Cum.Supp.).

*See Bruce v. State,* 317 Md. 642, 648, 566 A.2d 103, 106 (1989). So, the charge in the fifth count, not being a crime in this State at the time Kramer drove his vehicle in Maryland, should never have been submitted to the jury. The question is what was the effect of permitting the noncrime to go before the jury.

■ Trooper First Class Ralph G. Pierce of the Maryland State Police learned that the Pennsylvania license tags on Kramer's automobile had been issued by Pat's Auto Tags, a Pennsylvania licensing authority in Philadelphia. He procured a copy of the form completed by Kramer which was necessary to obtain the tags. It stated that the vehicle was insured by the Erie Insurance Group and gave the policy number. Pierce contacted Michael Gannon, an investigator for Erie whose duties were to investigate "suspicious insurance claims." Pierce asked Gannon to ascertain if Michael Kramer or Robert Kramer (Michael's father) was or had been insured by Erie. Gannon determined that

> there was no insurance by either individual at any time and also the number supplied me was not an insurance policy number.... It was not a correct number.

"These individuals are not and have never been policy holders with the Erie Insurance Company." Gannon so testified and a letter to this effect from Gannon to the Maryland State Police was admitted in evidence. Subsequently, in a statement Kramer gave Pierce, Kramer said that he had found an insurance certificate in an automobile in a junk yard. It was the name of the insurance company and policy number on that certificate that he gave the licensing authority to obtain the registration and license tags. All of this was admitted in evidence.

Potential prejudice is the overbearing concern of the law of this State with respect to the question of joint or separate trials of a defendant charged with criminal offenses. We have observed that joinder may be prejudicial to a defendant in three important aspects:

> First, he may be embarrassed, or confounded in presenting separate defenses.... Secondly, the jury may cumulate the evidence of the various crimes charged and find guilt when, if the offenses were considered separately, it would not do so. At the very least, the joinder of offenses may produce a latent hostility, which by itself may cause prejudice to the defendant's case. Thirdly, the jury may use the evidence of one of the crimes charged, or a connected group of them, to infer a criminal disposition on the part of the defendant from which he may also be found guilty of other crimes charged.

*McKnight v. State*, 280 Md. 604, 609, 375 A.2d 551 (1977). Maryland Rule 4-253(c) makes clear:

> Prejudicial Joinder.—If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice required.[4]

We believe it to be self evident that, as to the manslaughter charge, the potential prejudice in all three of the *McKnight* aspects arose from the insurance charge. That charge and the evidence with respect to it were permitted to go before the jury in the mistaken belief that the insurance offense was a crime. The lengths Kramer went to in order to register his automobile and obtain license plates for it—the fraud and deceit he practiced in taking a certificate from a junked car and submitting the name of the insurance company and policy number thereon to the licensing authority— not only could seriously affect his credibility in the eyes of the jury, but tended to show that he had a criminal disposition. The evidence with respect to the insurance charge

---

**4.** Joinder and severance of criminal trials was formerly governed by Md.Rule 745, and, prior to the adoption of that rule, by Md.Rule 734 and 735. The present Rule 4-253 is identical to its immediate precursor, Rule 745, which was virtually identical, in pertinent part, to its precursors, Md.Rules 734 and 735. Opinions of this Court citing to Rule 745 or 734 or 735 are appropriate for Rule 4-253.

enabled a rational inference that he was a scofflaw, willing to drive his car without the security which he obviously knew was required by the laws of Pennsylvania. This, in turn, was strong indication that he had a wanton disregard for the rights and welfare of others and that he would have little qualm in not abiding by the rules of the road in the operation of his automobile. In short, the evidence regarding the insurance charge, presenting an offense which was not even a crime, could embarrass and confound his defense, could enable the jury to cumulate inadmissible evidence to find guilt, could lead the jury to believe that he had a criminal disposition, and, at the very least, may have produced a latent hostility which by itself would unduly prejudice his case. We find that the evidence adduced on the insurance charge inevitably tainted the manslaughter conviction. Kramer is entitled to a reversal of both judgments.[5]

---

5. In his instructions the judge told the jury:

> Now, one of the charges in this case, which I'll go into a little bit later, is driving without insurance. Law of Maryland requires you to have insurance when you drive a car.

Later in the instructions the judge said: "I've already told you that it's illegal for one to drive on the road without insurance." The judge cautioned the jury that the insurance charge "must be considered by you as completely separate from the other charges." He warned:

> If you are convinced beyond a reasonable doubt that the Defendant is guilty of driving without insurance, you may not use that finding in any way in determining his guilt or innocence of the other charges. Any evidence you have heard or seen concerning Defendant's lack of insurance, any applications for insurance or investigations concerning insurance may not be considered as having any bearing on his guilt or innocence on the manslaughter charge or the other moving violations.

We pointed out in *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977), however:

> As we have recognized, the law frequently permits the jury to hear evidence admitted for a limited purpose, and presumes that the jury will comply with an appropriate instruction. But we are unwilling to make that assumption in circumstances such as these, where we have said that the prejudicial effect of the evidence heard by the jury outweighs its probative value. In the context of this case, ... the cautionary instruction simply cannot cure the prejudice.

*Id.* at 615, 375 A.2d 551. Likewise, in the case *sub judicia,* the cautionary instruction simply cannot cure the prejudice.

## II

■ In disposing of the appeal, the intermediate appellate court deemed it advisable to address another contention raised by Kramer—that the evidence was insufficient to prove he was guilty of manslaughter by automobile—"for possible guidance of the trial court should a double jeopardy plea be interposed before the trials of the indictments on remand." The court declared:

> With respect to both convictions, we have reviewed the evidence and we hold that it was legally sufficient to support the convictions.

*Kramer v. State, supra,* slip opinion at 3. We granted a cross petition filed by Kramer asking that we review the sufficiency of the evidence to sustain his conviction of manslaughter by automobile.

### A

We reprise in condensed form the evidence adduced at the guilt stage of the trial. Route 213 in Maryland around the scene of the accident is a two-lane road in a rural environment running approximately north and south through open fields and some wooded areas. Where the accident occurred the road curved slightly—an investigating officer characterized it as a "radial curve"—and the northbound and southbound lanes are separated by two solid parallel yellow lines, indicating a no-passing zone. Each lane is bordered on its right by a dirt shoulder.

Two cars were involved in the collision—Kramer's car, a 1979 Oldsmobile 98, equipped with a "350 engine and a 4–barrel" carburetor, which he had bought two weeks previously, and the car of William F. Miles, a 1979 Fiat, 4–door hatchback. A third car, that of Daniel Lee and his wife, Andrea, was involved, but not in the actual collision. Kramer was driving the Olds and there were five passengers. Anthony Brooks, 18 years old, occupied the right side of the front seat. Between him and Kramer was Tina Papavisini, 18 years old. James Simms, 18 years old, was in the right rear seat. His girlfriend, Renee Trott, 18 years old, was

next to him. Lisa Berry, 19 years old, was seated on her left. Mr. Miles was driving the Fiat with his wife next to him. In the rear seat were Al Miller and his wife, Sue Wharton Miller. The Lees' car was driven by Andrea Lee and her husband, Daniel, was on the passenger side of the front seat. All three cars were on Route 213, the Lee car and the Kramer car southbound, the Miles car northbound. The three cars met when they were within the no-passing zone of the road. The Lee car was going between 50 and 60 miles per hour. Kramer, overtaking the Lee car, attempted to pass on Lee's left, crossing the double yellow line into the northbound lane. When the Kramer car was beside the Lee car, the Miles car was approaching in the northbound lane. Mrs. Lee saw the lights of the Miles car and pulled off the road onto the shoulder of the southbound lane to give the Kramer car room to return to the southbound lane. But the Kramer car kept veering to the left and the Kramer car and the Miles car "just hit." Mrs. Lee observed: "It all happened within seconds. It was that fast. It was that quick." Miles was going about 50 miles an hour in the northbound lane when he saw headlights of a car in his lane. He pulled immediately onto the northbound lane shoulder to give the approaching car a "wide berth," but the Kramer car continued bearing to the left. Miles drove up an embankment to the right of the shoulder and thought he had evaded a collision, but the Kramer car caught the back half of the Miles car on the left rear to the right of the driver's door. Mr. Miller was still in the car badly hurt. Mrs. Miller had been thrown from the car and was about six feet away. She was dead.

Trooper First Class John Heckner of the Maryland State Police was a traffic homicide investigator, accepted as an expert in vehicle accident reconstruction. He had investigated some 100 accidents a year for the past 20 years. The no-passing zone started four tenths of a mile north of the accident and continued all through the accident scene. Despite the "radial curve" in the road, there was "clear visibility" in passing a car in that area. The first indication

of braking by the Oldsmobile was on the shoulder; there were no marks in the lane itself. The Olds came to rest on an uphill grassy embankment five feet nine inches off the northbound shoulder. There were skid marks 81 feet long to the point of impact and the car continued another 30 feet before it stopped after hitting the Fiat, which weighed 2,000 pounds. Despite the braking and the grassy embankment, the Olds was still going 37.9 miles per hour at the time of impact. The damage to the Olds was on the left front fender in the bumper area and continued back to the driver's door. When the Fiat was hit, it spun up the hill counterclockwise. The rear of the car was about 10 feet up the hill, the nose of the car stayed about where it was hit. Heckner was unable to estimate the speed of the Olds prior to the time it left the road due to the lack of skid marks on the road. He found no mechanical defects in either the Olds or the Fiat.

When Trooper Pierce interviewed Kramer at the hospital shortly after the accident, Kramer executed a brief statement. It read:

I was coming down the highway. I saw a car in front of me slow down really fast. I tried to avoid the car. As I did another car was coming in the other direction and we hit.

Q. Were you passing at the time?

A. Yes to try to avoid the car in front of me.

Q. How fast were you traveling?

A. About 55 mph.

Q. Were you aware of the yellow lane indicating no passing?

A. No, I wasn't.

About two months later, Pierce interrogated Kramer further. At first his version followed that of the prior statement, adding that he smelled alcohol on the breath of the woman driving the car in front of him. But when told of Mrs. Miller's death and was asked: "Is the first story a lie as to what happened?" he answered, "Yes, I was scared."

He then said that he had traveled [Route 213] "a lot," but this was the first time he had driven it without his parents. He admitted that he was going "at least 75 mph," that he had "pulled out suddenly," that he could not judge the speed of the car in front of him "but possibly very fast." He said that he "tried to pass car and I saw headlights. I swerved but he kept swerving with me." He maintained that he did not know that there was a no-passing zone. He agreed that the Lees' car could have slowed because he was coming so fast. He told Pierce that he did not see the Lees' car until he was "about two car lengths from it." On the witness stand, he said: "I was going too fast.... Between 65 or 70, somewhere around there. I'm pretty sure 70."[6] He admitted that he did not "actually notice" how fast he was going until he was "about maybe not even a car length behind" the Lees' car.

The passengers in Kramer's car indicated that his driving was "normal," and that he was not speeding. Shining through their testimony, however, was that none of them was really paying any attention to what was going on immediately before the accident. Papavisini said that she and Brooks were talking, playing with the radio: "We were like, messing around, arguing what station we wanted on the radio," which was on her and Brooks's lap. Trott and Simms testified that they were arguing about a chocolate Frosty that had spilled over her pants and were trying to clean it up. Berry said before the accident she was listening to the radio and looking out the window. In rebuttal, Miles denied that he had ever swerved to his left—he went to his shoulder and then headed more right, "I wanted to get out of the way." Both Mr. and Mrs. Lee said that the Kramer car never swerved toward the southbound lane; it kept going to the left toward the northbound shoulder.

---

**6.** A report by the Maryland State Police of its investigation of the accident was admitted in evidence. It showed that the speed limit on Route 213 where the accident occurred was 55 miles per hour and that it had been posted as such for over a year.

**590**

## B

### (1)

As we have seen, the judgment which Kramer would have us overturn here was entered upon his conviction of manslaughter by automobile. Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Article 27, § 388 provides in pertinent part:

> Every person causing the death of another as a result of the driving ... of an automobile ... in a grossly negligent manner, shall be guilty of a misdemeanor to be known as "manslaughter by automobile...."

Our decisions have uniformly interpreted this statute as requiring proof of gross negligence, which has been defined in this context as a wanton or reckless disregard for human life. *Abe v. State*, 230 Md. 439, 440, 187 A.2d 467 (1963); *Johnson v. State*, 213 Md. 527, 531, 132 A.2d 853 (1957); *Lilly v. State*, 212 Md. 436, 442, 129 A.2d 839 (1957); *Clay v. State*, 211 Md. 577, 584, 128 A.2d 634 (1957); *Duren v. State*, 203 Md. 584, 588, 102 A.2d 277 (1954). *See Nast v. Lockett*, 312 Md. 343, 350–352, 539 A.2d 1113 (1988). In each case, as a matter of law, the evidence must be sufficient beyond a reasonable doubt to establish that the defendant was grossly negligent, that is, that he had a wanton or reckless disregard for human life in the operation of an automobile. It deals with the state of mind of the defendant driver. Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind. Simple negligence will not be sufficient—even reckless driving may not be enough. Reckless driving may be a strong indication, but unless it is of extraordinary or outrageous character, it will ordinarily not be sufficient. *Id.* at 351–352, 539 A.2d 1113.

### (2)

The case at hand focuses on speed. Three and a half decades ago we observed in *Duren v. State*, 203 at 590, 102 A.2d 277:

Long before automobiles, with their power and speed measured in terms of the number of horses theoretically under their hoods, the courts held that allowing a horse drawn vehicle to proceed at an excessive or immoderate speed could constitute criminal negligence in a given environment.

We said:

It is plain that the environment in which speed is indulged must determine whether it does or does not show gross negligence at a given time. Speed in the open country on a four lane highway may be very high and not constitute negligence. A much lower rate of speed in a city street may constitute gross negligence. This, too, was the law long before automobiles existed.

*Id.* at 591, 102 A.2d 277. We quoted the Supreme Court of Illinois in its case of *Belk v. People*, 17 N.E. 744 (1888):

There can be but little distinction, except in degree of criminality, between a positive intent to do wrong and an indifference whether wrong is done or not ... As a rule, the care required is to be proportioned to the danger; hence driving rapidly in an open country highway may not be negligence, while the same character of driving in a thronged street or thoroughfare, or where there is known hazard to others, may be negligent in the highest degree.

*Duren*, 203 Md. at 592, 102 A.2d 277. We found it obvious that

what must be looked for in each case is whether, by reason of the speed in the environment, there was a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another.

*Duren* at 592, 102 A.2d 277. We concluded:

If there is found such lack of control, whether by reason of speed or otherwise, in a place and at a time when there is constant potentiality of injury as a result, there can be found a wanton and reckless disregard of the rights and

lives of others and so, criminal indifference to consequences.

*Id.* We quoted from *Duren* in *Lilly v. State,* 212 Md. at 443, 129 A.2d 839, and we repeated the *Duren* quote in *Lilly* in *Johnson v. State,* 213 Md. at 532–533, 132 A.2d 853. *See Clay v. State,* 211 Md. at 584, 128 A.2d 634.

(3)

To determine the sufficiency of the evidence to sustain a conviction, we must ascertain whether the trier of fact could have found from the evidence or inferences drawable therefrom that the defendant was guilty beyond a reasonable doubt. We view the evidence and permissible inferences in the light most favorable to the prosecution. This standard is derived from *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Branch v. State,* 305 Md. 177, 182–183, 502 A.2d 496 (1986); *Brooks v. State,* 299 Md. 146, 150–151, 472 A.2d 981 (1984); *State v. Rusk,* 289 Md. 230, 240, 424 A.2d 720 (1981); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980); *Wilson v. State,* 261 Md. 551, 563, 276 A.2d 214 (1971); *Royal v. State,* 236 Md. 443, 448–449, 204 A.2d 500 (1964).

It is true that, ordinarily, speed alone may not be a sufficiently negligent act to support an inference of criminal intent. It is also true that here the speeding was in a rural environment. Regardless, considering the nature of the road, it is apparent, in the language of *Duren,* that the evidence was sufficient for the jury to find that "by reason of the speed in the environment, there was a lessening of the control of [Kramer's] vehicle to the point where such lack of effective control [was] likely at any moment to bring harm to another." And, we believe it to be clear, that, the jury, weighing the speed in the light of the surrounding circumstances, could, again in the words of *Duren,* have found "such a lack of control, whether by reason of speed or otherwise, in a place and at a time when there [was] constant potentiality of injury as a result...." In addition to speed and lack of control, the factor of lack of attention

was present. In his brief, Kramer concedes that it could be inferred from the evidence that Kramer "failed to keep a proper lookout and thus came upon the Lee vehicle so suddenly that he had to swerve to avoid it." Thus, the evidence was legally sufficient for the jury to find on Kramer's part a wanton and reckless disregard of the rights and lives of others and so a state of mind amounting to criminal indifference to consequences.

## III

■ Our agreement with the reversal of the judgment entered on the manslaughter by automobile charge was not by reason of insufficiency of the evidence but because of its prejudicial joinder with the insurance charge. Therefore, Kramer may be retried for the manslaughter offense.

When a criminal defendant takes an appeal and succeeds in having his conviction reversed *on a ground other than the sufficiency of the evidence,* the Fifth Amendment's Double Jeopardy Clause does not preclude a retrial of the defendant on the same charges.

*Huffington v. State,* 302 Md. 184, 189, 486 A.2d 200 (1985) (emphasis in original; footnote omitted).

In other words, the "Double Jeopardy Clause precludes retrial 'once the reviewing court has found the evidence legally insufficient' to support conviction." *Tibbs v. Florida,* 457 U.S. 31, 40–42, 102 S.Ct. 2211, 2217–2218, 72 L.Ed.2d 652 (1982), quoting *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). *Accord Greene v. Massey,* 437 U.S. 19, 24–25, 98 S.Ct. 2151, 2154–2155, 57 L.Ed.2d 15 (1978); *Mackall v. State,* 283 Md. 100, 113–114, 387 A.2d 762 (1978).

*Warfield v. State,* 315 Md. 474, 502, 554 A.2d 1238 (1989).

AS TO COUNT ONE OF THE INFORMATION—MANSLAUGHTER BY AUTOMOBILE—JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED;

AS TO COUNT FIVE OF THE INFORMATION—DRIVING A VEHICLE WITHOUT REQUIRED SECURITY—

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED AS TO THE REVERSAL OF THE CONVIC-TION THEREON AND REVERSED AS TO THE RE-MAND FOR A NEW TRIAL THEREON;

COSTS TO BE PAID BY CECIL COUNTY.

McAULIFFE, J., dissents.

McAULIFFE, Judge, dissenting.

I disagree with Part I of the Court's opinion, and with the result the Court has reached. Kramer was charged with a crime. He was charged with driving a motor vehicle with knowledge that the motor vehicle was not covered by the required security, a violation of § 17–107(a) of the Trans-portation Article. Section 17–104 of the Transportation Article mandates the furnishing of the required security as a condition to, and a prerequisite for the continuation of, registration of a motor vehicle in this State. Section 13–402(a) requires that:

> Except as otherwise provided in this section or else-where in the Maryland Vehicle Law, each motor vehicle ... driven on a highway shall be registered under this subtitle.

Section 13–402.1 allows a nonresident to drive a foreign vehicle in this State without registering that vehicle in this State, but only under specified circumstances. If, for exam-ple, the State had been able to show that Kramer's vehicle was regularly operated in carrying on business in this State, the vehicle would not have been exempted from the require-ments of registration under § 13–402.1. Because § 17–104(b) requires the owner to maintain the required security for any "motor vehicle that is required to be registered in this State," the State could have argued that Kramer drove a vehicle that was required to be registered, and therefore needed to be covered by the required securi-ty, with knowledge that it was not so covered.

The State did not prove the charge of driving without the required security, and if Kramer had challenged that convic-

tion on the ground of insufficiency of the evidence, he would have prevailed. He did not do so, either in the Court of Special Appeals or in this Court. At all stages, the parties simply assumed that Maryland law required coverage for the Kramer vehicle while it was being operated in this State.

The question that this Court should have reached is whether the trial judge abused his discretion in denying Kramer's motion to sever the charge of driving without the required security from the remaining charges. Given the particular facts of this case, that becomes a close question. The trial judge was aware that the State's proof on the insurance charge would include the fact that Kramer fraudulently obtained registration for the vehicle in Pennsylvania by representing that he was insured when he knew that he was not. That fact would not have been admissible in a separate trial of the manslaughter and related charges, and it had a potential for improper prejudice against the defendant. These circumstances would have justified the granting of a severance. These circumstances did not, however, mandate the granting of a severance.

We are not dealing with the situation we faced in *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977), or in *State v. Jones,* 284 Md. 232, 395 A.2d 1182 (1979). Those cases involved the question of joinder of charges that were not part of a single transaction. Kramer's case involves the defendant's attempt to sever charges that did arise out of a single transaction. Under the clear language of the Court in *Jones,* this case falls within the exception to the general rule of non-joinder.

> We repeat; there must be a causal relation or logical or natural connection among the various acts or they must form part of a continuing transaction to fall within the exception.

*Id.* at 244, 395 A.2d 1182. Maryland Rule 4–203(a) recognizes the same distinction:

> Two or more offenses, whether felonies or misdemeanors or any combination thereof, may be charged in sepa-

rate counts of the same charging document if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Rule 4–253(c) permits the trial judge to sever counts properly joined in a single charging document, but the right to do so is committed to the sound discretion of the trial judge. Reversal for failure to sever charges properly joined in the first instance should be limited to those cases where the defendant is able to demonstrate a clear abuse of that discretion.

Maryland Rules 4–203 and 4–253 closely follow Federal Rules of Criminal Procedure 8 and 14. Accordingly, we should find persuasive the interpretation given those Rules by the federal courts. Referring to Rule 14, Professor Moore states:

> [T]he way the Rule is administered by the courts is to presume that if joinder is properly pleaded under Rule 8 then joint trials should follow. This places a heavy burden on a defendant moving under Rule 14 which is not satisfied by the claim that the defendant would have had a "better chance of acquittal" in a separate trial. (footnotes omitted).

8 *Moore's Federal Practice* § 14.02[1] (1983). The United States Court of Appeals for the Ninth Circuit has stated:

> The test is whether joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever.

*United States v. Brashier,* 548 F.2d 1315, 1323 (9th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). The trial judge in this case balanced the expense, inconvenience and delay that would necessarily be occasioned by separate jury trials against the possible prejudice that might result to the defendant from a single trial. He considered the fact that he could instruct the jury that they were not to consider any evidence bearing on the

insurance charge in determining the remaining charges, and vice versa.[1] I cannot say that the trial judge abused his discretion in denying the motion to sever.[2] I would reverse the judgment of the Court of Special Appeals and direct that judgment below be affirmed.

---

1. The trial judge did, in fact, give a comprehensive instruction to this effect.

2. Of course, if the defendant, who clearly had the burden of demonstrating prejudice, had informed the trial judge of the correct status of Maryland law relating to the necessity of insurance for foreign vehicles, and if the trial judge had consequently been made aware of the inherent weakness of the State's case as it related to this charge, the outcome may have been different. The defendant did not do so.