989 A.2d 759

**Lazara Arellano DeHOGUE**

v.

**STATE of Maryland.**

**No. 2186, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 24, 2010.

534

Michael R. Malloy (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, WOODWARD and KEHOE, JJ.

KEHOE, J.

This case presents us with the question whether a driver's conduct after an accident can constitute vehicular manslaughter. We conclude that it can.

On November 7, 2007, the Circuit Court for Baltimore County convicted appellant, Lazara Arellano DeHogue, of manslaughter by vehicle, failing to remain at the scene of an accident, failing to remain at the scene of an accident resulting in bodily injury, failing to remain at the scene of an accident resulting in death, failing to render assistance and give information in an accident resulting in death or bodily injury, knowingly failing to remain at the scene of an accident resulting in death, reckless driving, and negligent driving.

In her timely appeal, appellant raises one question, which we have rephrased as follows:

Was the evidence sufficient to support the trial court's guilty verdicts?

The answer to appellant's question is "yes" and we affirm the judgments of the circuit court.

## FACTUAL BACKGROUND

This case arises from a tragic series of events occurring on December 1, 2006. Appellant, while driving her Dodge pickup truck, struck Marjorie Thomas as she was crossing Goucher Boulevard pushing her three-year-old grandson, Elijah Cozart, in a stroller. After the impact, the stroller (with Elijah in it) became entangled underneath appellant's truck. Appellant continued to drive for almost a mile, dragging Elijah, before stopping to check beneath her truck. Ms. Thomas sustained a

broken leg and broken wrist. Elijah died as a result of his injuries. Appellant was apprehended at her home a short time later.

As a result of these events, an indictment was filed against the appellant charging her with the following:

Count 1—"Manslaughter by Vehicle" (MD.CODE ANN., CRIM. LAW § 2–209 (2002));

Count 2—"Failure to Control Speed to Avoid a Collision" (TRANSP. § 21–801(b) (1977, 2008 Repl.Vol.));

Count 3—"Driver Fail to Exercise Due Care" (TRANSP. § 21–504(a));

Count 4—"Driver Fail to Exercise Due Care" (Observation of Child) (TRANSP. § 21–504(c));

Count 5—"Driver to remain at scene—Accident resulting in Bodily Injury" (TRANSP. § 20–102(a));

Count 6—"Driver to remain at scene—Accident resulting in Death" (TRANSP. § 20–102(b));

Count 7—"Duty to Give Information and Render Aid" (TRANSP. § 20–104(b));

Count 8—"Duty to Render Aid" (TRANSP. § 20–104(a));

Count 9—"Driver to Remain at Scene" (TRANSP. § 27–113(b));

Count 10—"Driver to Remain at Scene" (TRANSP. § 27–113(c));

Count 11—"Reckless Driving" (TRANSP. § 21–901.1(a));

Count 12—"Negligent Driver" (TRANSP. § 21–901.1(b)).

A bench trial was conducted October 29, 2007 and ended on November 5, 2007.

At the trial, the State presented twenty civilian and police witnesses, as well as a stipulation as to a report of a medical examiner. Appellant did not call any witnesses in her defense. Since appellant raises the question of sufficiency of the evidence, we will review the evidence in some detail.

Bethany McCain testified that, at about 3:00 p.m. on December 1, 2006, she was driving on Goucher Boulevard, approach-

ing Colbury Road, intending to make a left turn. She was pulling up to make the turn when she saw an oncoming red truck hit a woman pushing a stroller. The woman fell. The stroller became lodged under the front of the truck. Ms. McCain screamed and banged on the inside of her window, but the truck continued down the boulevard. Ms. McCain called 911. Ms. McCain's testimony as to the accident was corroborated by Reggie Word and Theondres Johnson, an MTA bus driver, both of whom witnessed the accident.

Reginald Amos testified that he was stopped at the intersection of Colbury Road and Goucher Boulevard. A woman with a stroller walked past Mr. Amos' truck while he was sitting at the light and crossed Goucher Boulevard. The woman did not use the marked crosswalk, and she was crossing on a diagonal line. Mr. Amos heard the horn of a vehicle coming around the bend. The woman tried to move more quickly across the street. The front wheels of the stroller might have been on the median strip when the vehicle struck the woman and the stroller. Mr. Amos pulled around to where the collision occurred. The truck that struck the woman had stopped on the median. Two more cars stopped. The truck pulled off and came down off the median. Mr. Amos followed the truck and noticed that the baby stroller was lodged underneath the right front passenger side wheel.

Mr. Amos testified that he briefly lost sight of the truck. He turned onto Regester Avenue and saw the truck stopped on a curb. Two women were outside the truck. The women were pulling the stroller out of the front passenger side wheel. They set it down. Mr. Amos stopped in front of them. He told the driver to stop but did not know if she understood him. Mr. Amos spoke to a woman who had come out of a neighboring house. The truck drove off. He and the neighbor walked to a nearby grassy area and found the child which apparently had been dislodged from the truck when it jumped the curb. The truck made skid marks and tracks on the grass after it had jumped the curb and before it came to a stop.

Cristal Douglass testified that, while she was driving on Loch Raven Boulevard near Colbury, she saw a truck to her left in the left lane, and a stroller holding a baby caught under the truck. At a red light, the vehicles stopped and Ms. Douglass leaned out her window and said, "you have a stroller under your car," but she could not get the attention of the driver. Ms. Douglass yelled and blew her horn. When the light turned green, the truck pulled ahead of Ms. Douglass into the right lane and made a right turn.

Keith Hill testified that he was at a light on Loch Raven Boulevard when he heard a loud sound like a tire screeching. Then he heard another sound like something being dragged. He saw a red truck coming from Goucher Boulevard. His light turned green. As he passed the truck, he saw what looked like a stroller with a baby doll in it. He blew his horn to try to warn the driver that she had something stuck under her truck. The driver did not stop or acknowledge him in any way.

Dona Chalmers testified that while driving on Loch Raven Boulevard, she saw a red pickup truck turn onto Loch Raven. The truck had a stroller stuck under the front passenger side. There were sparks coming from underneath the truck.

Ghislaine Eichhorn testified that she was in her home on Regester Avenue when she heard "very loud squealing tires that went on for some time." She went outside to look around and saw a pickup truck stopped on someone's lawn. There were two women, one holding an infant on her hip, near the pickup truck. They got back in the truck and drove off. A man in another truck pulled up and spoke to Ms. Eichhorn. She walked to where the truck had stopped and saw a stroller was nearby. She walked farther and found a child who was moving. She continued to walk toward the child and saw that he was badly injured. The child was located about two truck lengths behind the spot where the truck had stopped.

Officers Robert Erickson and Dominick Rizzo of the Baltimore County Police Department were two of the officers who responded to the scene of the accident. Officer Erickson

testified as to photographs of the accident scene. He identified drag marks, pieces of material from the stroller, material from clothing, and blood in pictures from the accident scene. Officer Rizzo testified that he followed what looked like a drag mark from Goucher, to Loch Raven, and then onto Regester Avenue. On Regester, there were two skid marks that went over a curb, onto grass, and stopped in a driveway. There was a broken stroller in the driveway. Officer Rizzo looked back from the driveway about fifteen feet and saw the child along the right tire mark. The child appeared to be breathing rapidly, his hands were opening and closing and he seemed to follow the officer with his eyes. Officer Rizzo called for an ambulance.

Detective Steven Sodd testified that he went with another officer to appellant's apartment. Appellant opened the door when they knocked. Detective Sodd asked appellant in English who was driving the truck. Appellant answered that she had been. Appellant said that the accident was not her fault, and that she had the green light. She said that she had attempted to swerve to the left. Detective Sodd asked appellant why she did not stay at the scene. Appellant replied that she had to pick up or be with her children.

Officer Manual Rios testified that he transported appellant from her home to the police station. She appeared to be upset. She denied knowing that there was a baby in the stroller. At the police station, appellant was placed in an interview room. Officers Eckstein and Murray conducted the interrogation. Officer Rios acted as a translator.

According to Officer Rios, appellant said that, as she drove around a bend on Goucher Boulevard and proceeding through a green light, she saw a woman pushing a stroller from right to left. The woman seemed indecisive. Appellant beeped her horn. As appellant approached, the woman made a sudden jolt across appellant's lane. Appellant swerved left up onto the median strip to try to avoid the woman. Officer Rios described a portion of appellant's statement as follows:

Okay, she's thinking about changing lanes. She's traveling towards Walker Avenue as she describes it, and the female suddenly cuts in front of her. And she tried to veer to her left and strikes the median in the process. And then she's not sure ... if she hits anything, but she says her brakes are starting to act strange, her vehicle is handling strangely, so she turns off this road. . . .

\* \* \*

She turns right onto a road that was not Walker Avenue, and I do recall her clearly saying that she stopped because she almost hit a pole because of the vehicle handling strangely. She exits her vehicle, looks under her vehicle and sees a bluish/green what looks like a stroller lodged under her vehicle. She pulls it out, throws it to the side, gets back in her vehicle and leaves the scene.

Officer Rios further testified that appellant stated that she did not know, at that point, that there had been anyone in the stroller. Appellant had not returned to the scene because she did not know whether she could control her vehicle and she had to let her children into the house. She was concerned that her small children would come home and there would be nobody there. Appellant was extremely upset when Officer Rios told her that the baby in the stroller had died.

Kenia Santos was a passenger in appellant's vehicle at the time of the accident. She testified that appellant was taking Ms. Santos and her son back to Ms. Santos' apartment after a shopping trip to Wal Mart. Appellant was driving the speed limit, 25 or 30 miles an hour. Ms. Santos stated that the traffic light was green. Ms. Santos saw a woman in the middle of the street but did not know that she was pushing something. Appellant sounded the horn two or three times. The woman turned around, and, in an instant, went in front of the truck. The truck suddenly jolted and went up to the left. The following colloquy occurred:

[THE STATE]: What, if anything, did the Defendant Lazara say to you?

[THE WITNESS]: She said that somebody got in her way. She didn't know what is was. She said somebody crazy or drunk, crazy people on the street.

[THE STATE]: Did she say anything else about this lady?

[THE WITNESS]: I don't remember.

[THE STATE]: What happened next?

[THE WITNESS]: She kept on driving.

Ms. Santos testified that she did not see a baby or a stroller. Ms. Santos said the windows were rolled up and she did not hear any strange noise.

Ms. Santos testified that appellant then turned onto a street. Ms. Santos thought the truck was going to hit a pole and turn over. The truck stopped at a slope in front of a lamp post. Appellant got out of the truck to inspect and removed a stroller from under the truck, and put it in front of the truck. Ms. Santos thought appellant had hit the stroller after turning onto the road where they stopped. Ms. Santos got out of the truck with her baby. She did not see a child on the ground. Ms. Santos and appellant got back in the truck and drove to their apartments. Ms. Santos dropped her son off at the home of the person who took care of him because she knew that the police would come for them. Ms. Santos and appellant then went to appellant's apartment. Ms. Santos testified that appellant said that she would go back to the scene of the accident because she had hit somebody.

Sergeant Nicholas Over testified that he inspected a 1999 Dodge Ram at the police garage. There was no noticeable damage on first inspection. The brakes appeared to work properly. The right front tire had a section that appeared to have been ground down.

Officer Tracie Eckstein, a member of the Baltimore County Police Department's Crash Team, was accepted as an expert in crash reconstruction. Officer Eckstein testified that she went to the locations involved in this case and participated in the interview of appellant. Officer Eckstein testified about the presence of a scuff mark on the median strip indicating that one of the tires stopped rotating, and then a drag mark or

skid marks indicating that the front and rear tires "locked up." The skid mark continued from Goucher Boulevard to Loch Raven Boulevard and then Regester Avenue, where there were four skid marks where the vehicle slid off the road. The vehicle traveled 0.85 miles after the accident before stopping on Regester Avenue. Officer Eckstein testified that it had rained on the day of the accident prior to the accident.

Officer Eckstein testified that she concluded that Ms. Thomas had left the curb thirty feet from a crosswalk and was walking diagonally across Goucher Boulevard at the time of the accident. When questioned by Officer Eckstein after the accident, Ms. Thomas said that she could not remember the accident.

Marjorie Thomas testified that as a result of the accident, she suffered a broken left leg and broken wrist. Ms. Thomas was hospitalized for four days.

The State and appellant stipulated that the Office of the Chief Medical Examiner for the State of Maryland performed an autopsy on Elijah. Ling Li, M. D., an assistant medical examiner, testified as to the autopsy. For the purposes of this opinion, it is sufficient to say that Dr. Li concluded that Elijah did not die as a result of the truck's initial impact with the stroller. Elijah was asphyxiated as a result of being caught beneath appellant's truck and, at the same time, suffered massive injuries caused by his being rubbed against a "very hard, rough surface ... such as pavement." Dr. Li concluded that Elijah probably died of his injuries at or before the time he was dislodged from beneath the truck "[b]ut, of course, I do not know that."

On re-direct examination, Dr. Li testified:

[THE STATE]: In your reasonable degree of medical certainty, absent the continued driving and the continued pressure of the child under the vehicle, would the child have suffered any of the injuries in the torso area that are observed in those pictures?

[THE WITNESS]: Let's see.

(Referring to report.)

Certainly not those deep open wounds.

[THE STATE]: Okay. Absent the continued pressure of being lodged underneath a vehicle, do you have an opinion with a reasonable degree of medical certainty whether Elijah would have suffered from compressional asphyxiation absent that activity?

[THE WITNESS]: The continued?

[THE STATE]: Correct.

[THE WITNESS]: I probably cannot say that, because the compression asphyxia, you can sustain compression asphyxia just be [sic] lying there and something falling on top of you. You do not need to [sic] this movement.

[THE STATE]: Let me ask you this, hypothetically, if a person was struck and body remained with nothing on top of it, nothing being dislodged, is it likely that a person in that state would suffer compressional asphyxiation?

[THE WITNESS]: No.

After the State closed its case, appellant's counsel moved for judgments of acquittal. The trial court granted appellant's motion as to Counts 2 (failure to control speed to avoid a collision), 3 (failure to exercise due care), and 4 (failure to exercise due care upon observing a child) and denied it as to the remaining counts. The court stated that the denial of acquittal was based on appellant's post-impact conduct and not on her pre-impact driving. The court found no criminal pre-impact conduct.

Appellant elected not to testify. Defense counsel rested appellant's case. Appellant's attorneys renewed the motion for judgments of acquittal. The Court reserved its ruling on the renewed motion. The prosecutor and appellant's counsel gave closing arguments. The trial judge found appellant guilty of automobile manslaughter, failing to remain at the scene of an accident, failing to remain at the scene of an accident resulting in bodily injury, failing to remain at the scene of an accident resulting in death, failing to render assistance and give information in an accident resulting in death or bodily injury, knowingly failing to remain at the

scene of an accident resulting in death, reckless driving, and negligent driving.

On November 16, 2007, appellant was sentenced to ten years incarceration for the crime of vehicular manslaughter and the merged convictions for reckless driving and negligent driving. Appellant was further sentenced to five years for the crime of failing to remain at the scene of the accident and merged convictions for related lesser offenses, which was to be served concurrently with the manslaughter sentence. Appellant filed her appeal on November 29, 2007.

Additional facts will be provided as necessary to support the analysis of the issues.

## STANDARD OF REVIEW

Our review of a case tried before a judge is governed by Rule 8–131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

■■ The standard for our review of the sufficiency of the evidence to support a criminal conviction is whether, on the evidence presented taken in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citation omitted). The fact-finder "possesses the ability to 'choose among differing inferences that might possibly be made from a factual situation,'" and the appellate court "must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." *State v. Suddith,* 379 Md. 425, 430, 842 A.2d 716 (2004) (citations and footnote omitted).

 Nonetheless, as this Court stated in *Polk v. State,* 183 Md.App. 299, 961 A.2d 603 (2008):

> An assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law. This is an area wherein the reviewing court is not at all deferential to the trial court. It makes the same determination on the same basis as does the trial court. In assessing legal sufficiency, we will look only at that which was formally received in evidence.

*Id.* at 306, 961 A.2d 603.

The Court of Appeals has said that the concern of the appellate court

> is not whether the verdict below was in accord with the weight of the evidence, but rather, whether there was sufficient evidence at trial "that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt."

*State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998) (quoting *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994)).

## ANALYSIS

A. *The Sufficiency of the Evidence for the Negligent Manslaughter by Vehicle, Reckless Driving and Negligent Driving Convictions.*

 Manslaughter by vehicle is a statutory offense in Maryland. In pertinent part, Crim. Law § 2–209(b) states: "A person may not cause the death of another as a result of the person's driving, operating, or controlling a vehicle or vessel in a grossly negligent manner." The crime of manslaughter by vehicle incorporates, as lesser included offenses, reckless driving and negligent driving. *Pineta v. State,* 98 Md.App. 614, 622, 634 A.2d 982 (1993) (reckless driving); *Gianiny v. State,* 320 Md. 337, 343, 577 A.2d 795 (1990) (negligent driving.). Because the charge of automobile man-

slaughter necessarily incorporates the lesser included offenses of reckless driving and negligent driving, we shall first discuss whether the evidence was sufficient to support appellant's conviction for automobile manslaughter.

"The common law standard of 'gross negligence' has been adopted in cases of automobile manslaughter as the minimum requirement for a conviction." *Skidmore v. State,* 166 Md.App. 82, 86, 887 A.2d 92 (2005) (quoting *Faulcon v. State,* 211 Md. 249, 257, 126 A.2d 858 (1956); *State v. Gibson,* 4 Md.App. 236, 243–43, 242 A.2d 575(1968), *aff'd,* 254 Md. 399, 254 A.2d 691 (1969)). In the context of manslaughter by vehicle, "gross negligence" has been defined as " 'a wanton or reckless disregard for human life.' " *Skidmore,* 166 Md.App. at 86, 887 A.2d 92 (quoting *State v. Kramer,* 318 Md. 576, 590, 569 A.2d 674 (1990)) (citation omitted). As the Court of Appeals explained in *Kramer:*

> In each case, as a matter of law, the evidence must be sufficient beyond a reasonable doubt to establish that the defendant was grossly negligent, that is, he had a wanton or reckless disregard for human life in the operation of an automobile. It deals with the state of mind of the defendant driver. Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind.

*Kramer,* 318 Md. at 590, 569 A.2d 674.

Simple negligence is insufficient to support a conviction for manslaughter by vehicle. *Id.* at 590, 569 A.2d 674. Even reckless driving may not be enough to prove gross negligence, though it may be a strong indication of the necessary state. *Id.*

Appellant contends that there was insufficient evidence for the trial judge to conclude that she acted in a grossly negligent manner. In support of her argument, appellant emphasizes that the trial court found no evidence that appellant had acted in a negligent manner prior to the accident. Therefore, any findings of gross negligence were based solely upon appellant's actions after the initial impact with Ms. Thomas and Elijah's stroller. Appellant asserts that she was not

grossly negligent in continuing to operate the truck after the accident based upon the knowledge that she had at that time because she did not realize that she was dragging the stroller until she was forced to stop due to her inability to control the truck. Appellant concedes that she knew that she had probably hit Ms. Thomas, and that in hindsight, she should not have continued driving.

Appellant's arguments are not persuasive.

We begin our analysis with the trial court's conclusion that appellant was not negligent prior to the impact with Elijah and his grandmother. Appellant's criminal responsibility arises, if it arises at all, solely upon her behavior after the impact.[1] The evidence demonstrates that appellant observed Ms. Thomas pushing a baby stroller across the road in front of her truck. Appellant sounded her horn, attempted to swerve to avoid a collision, driving up onto the median to do so. She then commented to her passenger that someone had gotten into her way. The passenger testified that she thought appellant had struck Ms. Thomas, and that appellant stated that she wanted to go back to the scene of the accident to find out what happened. Instead of immediately stopping her vehicle, however, appellant drove off the median and left the scene of the accident.

Appellant continued on her way for nearly a mile, despite the fact that the passenger's side front tire was not rotating. Numerous witnesses shouted, sounded their horns, and otherwise attempted to alert her that her vehicle was dragging the stroller. Furthermore, appellant admitted to the police that she knew her truck was not operating properly and multiple witnesses noted that there were loud noises and sparks being

---

1. In a series of cases, this Court has held that a defendant's post-impact behavior, usually leaving the scene of the accident, gave rise to an inference of gross negligence prior to or at the time of impact. *See Allen v. State*, 39 Md.App. 686, 696, 389 A.2d 909 (1978); *Blackwell v. State*, 34 Md.App. 547, 559, 369 A.2d 153 (1977); *Boyd v. State*, 22 Md.App. 539, 550–51, 323 A.2d 684 (1974). Our research has not disclosed a Maryland case where the question of guilt turned exclusively upon post-impact conduct.

generated by the stroller which was lodged in the passenger-side wheel well. Nonetheless, appellant did not stop to investigate what was wrong with her truck.

Dr. Li's testimony established that there were two independent causes of Elijah's death: compressional asphyxia and the massive trauma wounds suffered by Elijah as a result of his being dragged by appellant's vehicle. A fact finder could conclude from Dr. Li's testimony that, had appellant immediately stopped after the impact, Elijah would not have suffered the injuries that caused his death.

Based upon all of the evidence, a rational trier of fact could have found beyond a reasonable doubt that under the circumstances, appellant's post-impact conduct was "extraordinary and outrageous." *Kramer,* 318 Md. at 590, 569 A.2d 674. The trier of fact could further have reasonably concluded that appellant's actions demonstrated a "willful and wanton disregard for life," *id.,* and that appellant's post accident actions caused Elijah's death.

In sum, we hold that the evidence of appellant's continued operation of her vehicle after striking Ms. Thomas was sufficient for the trial judge, the trier of fact in this case, to have found that appellant was grossly negligent. Therefore, we conclude that the evidence was sufficient to convict appellant of offenses of vehicular manslaughter by motor vehicle, reckless driving, and negligent driving.

### B. The Sufficiency of the Evidence for Failure to Remain at the Scene of an Accident.

Appellant was convicted on Count 5—"Driver to remain at scene—Accident resulting in Bodily Injury" (TRANSP. § 20–102(a)), Count 6—"Driver to remain at scene—Accident resulting in Death" (TRANSP. § 20–102(b)), Count 9—"Driver to Remain at Scene" (TRANSP. § 27–113(b)), and Count 10— "Driver to Remain at Scene" (TRANSP. § 27–113(c)). Sections 20–102 and 27–113 of the Transportation Article require the driver of any vehicle involved in an accident resulting in death or serious bodily injury to immediately stop as close to the

scene of the accident as possible in order to provide the information and assist injured persons.[2]

The purpose of Maryland's "hit and run" statute is to discourage the driver of a vehicle which has been involved in an injury-causing accident from abandoning persons who are in need of medical care, and to prevent that same driver from attempting to avoid possible liability. *Comstock v. State,* 82 Md.App. 744, 754–55, 573 A.2d 117 (1990). Knowledge of both the underlying accident and injury is logically and legally necessary for one to be guilty of leaving the scene of a personal injury accident under this section. *Id.* at 755–57, 573 A.2d 117. Where conditions are such that the driver should have known that an accident occurred, or should have reasonably anticipated that the accident resulted in injury to a person, the requisite proof of knowledge is present. *Id.* at 757, 573 A.2d 117.

---

2. Transportation Article § 20–102 provides:

§ 20–102 **Driver to remain at scene—Accidents resulting in bodily injury or death.**

(a) Bodily injury.—

(1) The driver of each vehicle involved in an accident that results in bodily injury to another person immediately shall stop the vehicle as close as possible to the scene of the accident, without obstructing traffic more than necessary.

(2) The driver of each vehicle involved in an accident that results in bodily injury to another person immediately shall return to and remain at the scene of the accident until the driver has complied with § 20–104 of this title.

(b) Death.—

(1) The driver of each vehicle involved in an accident that results in the death of another person immediately shall stop the vehicle as close as possible to the scene of the accident, without obstructing traffic more than necessary.

(2) The driver of each vehicle involved in an accident that results in the death of another person immediately shall return to and remain at the scene of the accident until the driver has complied with § 20–104 of this title.

Transportation Article § 27–113 is the penalty provision for § 20–102. Section 27–113(c) provides for an enhanced penalty when a driver leaves the scene of an accident "who knew or reasonably should have known that the accident might result in the death of another person and death actually occurred to another person . . ." involved in the accident.

Appellant expressly states that she does not challenge the sufficiency of the evidence supporting her conviction for failing to remain at the scene of an accident resulting in bodily injury, as charged in Count 5. Concerning Count 6, appellant asserts that there was no proof that, when she left the scene of the accident, she knew that there had been a fatality. Appellant further contends that there was no proof that appellant knew or reasonably should have known that the accident might have resulted in either death or a serious bodily injury to another person. Our analysis of the evidence leads us to a different conclusion.

Ms. Santos, the adult passenger in appellant's vehicle, testified that appellant had actual knowledge that she had hit Ms. Thomas. Therefore, a rational trier of fact could have found beyond a reasonable doubt that appellant knew or should have known that death or serious bodily injury was the foreseeable result of hitting a person with her large truck. *See Comstock,* 82 Md.App. at 757, 573 A.2d 117. The evidence also clearly demonstrates that serious bodily injury actually occurred to Ms. Thomas, and death occurred to Elijah, as a result of appellant's actions.

Appellant does not deny that she failed to stop her vehicle at the scene of the accident. Nor did appellant make any effort to contact the police or to return to the scene of the accident later to provide the required information.

Based upon all of the evidence, we hold that appellant's failure to remain at the scene of the accident when she knew or should have known that a serous bodily injury or death had occurred was sufficient to support the convictions for failure to remain at the scene of an accident.

C. *The Sufficiency of the Evidence for the Failure to Render Aid.*

Appellant was also charged with two counts of failure to give information and render aid in violation of Section 20–

104 of the Transportation Article.[3]

Appellant asserts that the evidence adduced at trial was insufficient to prove that she failed to report the accident to the police because the police came to her apartment within minutes after the accident, and she immediately acknowledged that she had been the driver of the truck.

Appellant does not contest the evidence of record demonstrating that she left the scene of the accident and returned to her home. Though appellant acknowledged to the police that she possessed two cell phones at the time of the accident, at no time did appellant call the police to report the accident. Nor did appellant call an ambulance to render aid to Ms. Thomas.

Appellant's subsequent cooperation with the police when they confronted her at her home has no bearing on her previous failure to comply with the law at the time of the accident.

Based upon all of the evidence of record, a rational trier of fact could have concluded beyond a reasonable doubt that appellant failed to render aid and provide information as required by Section 20–104.

## CONCLUSION

There was sufficient evidence to support each of the verdicts entered by the trial court.

---

**3.** Section 20–104 provides in pertinent part:

§ 20–104. **Duty to give information and render aid.**

(a) Rendering assistance.—The driver of each vehicle involved in an accident that results in bodily injury to or death of any person ... shall render reasonable assistance to any person injured in the accident and, if ... it is apparent that medical treatment is necessary, arrange for the transportation of the person to a physician, surgeon, or hospital for medical treatment.

(b) Duty to give certain information.—The driver of each vehicle involved in an accident that results in bodily injury to or death of any person ... shall give his name, his address, and the registration number of the vehicle he is driving and, on request, exhibit his license to drive, if it is available. ...

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-
MORE COUNTY AFFIRMED. COSTS TO BE PAID BY
APPELLANT.