## PALMER *v.* STATE

[No. 27, September Term, 1960.]

342

*Decided October 27, 1960.*

*The cause was argued before* BRUNE, C. J., *and* HENDER-
SON, HAMMOND, PRESCOTT *and* HORNEY, JJ.

*Edward D. E. Rollins, Jr.,* for appellant.

*Lawrence F. Rodowsky, Assistant Attorney General,* with
whom were *C. Ferdinand Sybert, Attorney General,* and *J.
Albert Roney, Jr., State's Attorney for Cecil County,* on the
brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

This appeal involves an unusual case, and develops out of a deplorable and distressing set of circumstances. The appellant (or defendant) now some eighteen or nineteen years of age, was convicted by the trial judge of the Circuit Court for Cecil County, sitting without a jury, of involuntary manslaughter.

The theory of the state's case is that the appellant was guilty of gross, or criminal, negligence in permitting her paramour to inflict, upon her twenty months' old child, prolonged and brutal beatings that finally resulted in the child's death; and that her said negligence, under the circumstances here presented, was a proximate cause of the child's death. The defense argues that the appellant's conduct did not measure up to gross, or criminal, negligence; and her negligence, if any, was not a proximate cause of the death. In order to answer these opposing theories, it will be necessary to set forth below, somewhat in detail, the unpleasant and sordid facts leading up to the baby's unfortunate decease.

By the Code (1957), Article 72 A, Section 1, the father and mother of minor children are jointly and severally charged with their "support, *care,* nurture, *welfare* and education." (Emphasis supplied.) Thus, it is seen that the appellant herein was legally charged with her minor child's care and welfare; and we stated in *Craig v. State,* 220 Md. 590, 596, 155 A. 2d 684, that where the defendant owed to a deceased person a specific legal duty, but failed to perform the same, and death resulted to the deceased because of the non-performance of the duty, (at least under circumstances where the failure to perform constituted gross and wanton negligence) the defendant is guilty of involuntary manslaughter. It was also pointed out in that case that "gross, or criminal, negligence," where it is used as a basis for a charge of involuntary manslaughter, has been interpreted by this Court to mean "a wanton or reckless disregard for human life."

The appellant was raised in Oxford, Pennsylvania. According to her father, she was "prone to go wild," beginning in her freshman year in high school, and quit school, permanently, the following year. At the age of fifteen, she became

344

pregnant by one Palmer, who married her in August of 1957. Theresa A. Palmer (Terry), the victim of the subject homicide, was born four months later.

Palmer and the appellant separated shortly after their marriage (and were not divorced at the time of trial), and, in October, 1958, she met Edward P. McCue. He was twenty-one years' old and a native of Louisiana. The appellant knew that he, too, was married and was separated from his wife and a young son. Her relationship with McCue rapidly developed into something more than that of friendship. In May, 1959, he went to Louisiana, where he was soon followed by the appellant, the baby having been left with her parents. They lived together in Louisiana and Mississippi, and, when he was unable to secure employment in the South, they returned, in the early or middle summer of 1959, and took up their residence with her parents.

Her father became dissatisfied with the manner in which McCue chastised and punished little Terry. On July 31, 1959, she was not eating her dinner to suit McCue, so he "came over [to the table] and whacked her." The blow given the child was of sufficient force to make the appellant's father say to McCue, "wait one damn minute here" this is "the last time you are going to lay a hand on her in this house," and then to order him from the home. This, apparently, was done in the defendant's presence, as she testified that her parents' disapproval of McCue's treatment of Terry was "partly" responsible for his leaving their home in Oxford.

McCue left the next day and acquired a third-floor apartment at Cox's apartment house in Rising Sun, Maryland, where he was joined by the appellant and her baby over the next week-end, August 7-9. The apartment house was a duplex building with an apartment on each floor of each side. The treatment of the child during the next few weeks, the last for Terry, was described by other tenants of the building and a neighbor from the house next door.

Mrs. Copenhaver occupied the second-floor apartment immediately below the appellant's. Within about four days after Terry's arrival, she became aware that the child was being severely and brutally whipped by McCue. She was greatly

disturbed by the "tormenting" and protracted nature of the whippings. McCue would order the child to hold out her hand, and then he would slap her. Then he would say, "Where's your baby doll"? When the child reached for it, there would be a loud slap. This would be repeated over and over again. His tone of voice was "crafty, nauseatingly, I just can't imagine the voice he used. * * * It's just beyond description. * * * It's so terrible." He would "scream at her." "It wasn't just the whipping by any means. It was the treatment the child went through."

One Saturday night, Mrs. Copenhaver arrived home at about 10:00 P. M. McCue was whipping the baby. He whipped her constantly until eleven o'clock. By this time, the witness was so upset, she sent her husband to find a policeman. The appellant asked McCue to stop, but the whipping continued and he dragged "her [the baby] up and down the hall and beating and beating her, and it was just awful." Finally, the appellant exclaimed, "My God, Eddie, you have opened up her soft spot!" McCue retorted, "You think I did that? You must be nuts." The witness heard no more that night. When the policeman finally arrived, he said that he could not take any "real" steps until Monday.

The next morning, a Sunday, Mrs. Copenhaver heard McCue whipping the child again. She could stand it no longer. She went to the stairs and called McCue. She asked him (in the presence of the appellant) what he was trying to do to the child, "was he trying to kill her?" He told her to mind her own business, "that he would do exactly as he pleased with her." The witness warned him that there were things that could be done to people for mistreating children and he would be "handled."

About one hour later appellant came down to see Mrs. Copenhaver. She pleaded with the witness not to have "Eddie" arrested. The mother stated that the witness did not realize the trouble McCue would get into if he were arrested, that she loved him, and that the witness must have been imagining that the beatings were more severe than they actually were. Appellant explained that McCue was worried over some difficulty at work and was bothered by the heat. The

witness pointed out and cautioned that that was no reason to "beat your kid to death." The witness's offer to speak to McCue was spurned and appellant stated she believed she could get it straightened out.

On one other occasion, McCue had pushed the baby on the stairs and was "beating" her. The appellant asked him to stop and said: "Look what you have done." Whereupon, the beating terminated. And on two other occasions when McCue was "just whipping" the infant, the witness heard the appellant say, "she's had enough," but McCue failed to desist, and kept on whipping little Terry for, what seemed to the witness, an "interminable time."

For two weeks, during the time that the appellant, Terry and McCue occupied the apartment, Mrs. Copenhaver, who had purchased a home, was absent from her apartment a great deal of time, doing shopping in the daytime and spending the evenings in the country because of the heat.

Mrs. Sarah Gray occupied an apartment that consisted of the first and second floors of the duplex building on the other side from the appellant. She saw Terry nearly every day, and, except for the first two or three days after her arrival, she had bruise marks on her at one place or another, including her chest and the backs of her legs. The marks were not on the "same places all the time." On one occasion, Terry and her mother were visiting the witness's apartment. The child, who was wearing sunglasses, raised them. The infant's left eye was completely closed by swelling and was as black as a man's black suit. The right eye was also black, and was almost closed by swelling. When the witness cried out, "My God, what is wrong with that child"? the appellant replied, "I don't know. She just gets that way."

On the evening of Friday, August 21, 1959, about 9:45 P.M., Mrs. Gray was in her bedroom. Through her open window, which was near the open door to appellant's apartment on the floor above, she could hear McCue "beating" the child. He was whipping the infant with something leather. It sounded like a belt. Mrs. Gray heard McCue ordering the child to "Lay down." "Stand up." "Turn around." Each time he would strike the infant four or five times. There was

not even the lapse of two minutes between commands. It just went on, "over and over and over." The witness heard appellant exclaim "Eddie" in a frantic voice. He said, "You shut up too." After listening through the window for approximately 20 minutes, Mrs. Gray went to Mrs. Carter's house next door. She and Mrs. Carter stood outside and listened. They could hear the same thing going on and on, over the sound of the radio which was playing in appellant's apartment.

Mrs. Carter corroborated Mrs. Gray as to what had occurred after Mrs. Gray came to her house, and further stated that the child was crying with the cry of a child who was "being hurt bad." About a quarter to eleven, Mrs. Gray and Mrs. Carter roused Mrs. Cox, the landlady and occupant of the first floor apartment on the same side of the building as appellant. Mrs. Cox had not heard any noise, because her air conditioner was on. The three women stood outside under a tree. Mrs. Cox remained about five minutes. She heard the slaps of a belt hitting flesh. Mrs. Carter and Mrs. Gray remained and heard the whipping continue until about midnight, a minimum period of some two hours and fifteen minutes. About midnight there was a thump which sounded like a body hitting against the wall or the floor. That was the last Mrs. Gray heard from the apartment that night.

Mrs. Dorothy Bienviaje moved into the third-floor apartment on the other side of the building from the appellant on Saturday, August 22nd, the day following the lashing that continued for two and a quarter hours. On the day of her arrival, she noticed that Terry had a black eye, and it was not over three days before she, too, realized that Terry was being whipped too often, too frequently. The whippings were not like spanking a child four or five times on the bottom: they just kept on and on, and had a rhythm to them that the witness could not help but notice. She also saw the child's eyes when they were red-rimmed from crying, and the baby's face when it was bruised.

Within the last five days of Terry's life, McCue literally bit the child on both buttocks. This fact was not only admitted by both McCue and the appellant, but the cup-shaped marks

left by the upper and lower teeth were visible on both of the infant's buttocks after death. McCue told appellant that he had bitten the baby because she had bitten him, and the appellant testified that she considered his conduct proper, since Terry had bitten him.

On the day of death, McCue was in the apartment all day with Terry. He began beating the child again. He stated that he "beat her with his fist, his hand and a belt." Appellant was in and out of the apartment throughout the day. About 6:00 P.M. McCue struck the infant with a blow or blows which literally ripped the infant's liver nearly in two and which tore the mesentery, a fatty, vascular tissue supporting the colon by connection to the abdominal wall. This was the culmination of his inexpiable offenses against the defenseless little child (for which he was tried, convicted and sentenced). Hemorrhaging into the peritoneal cavity ensued. The baby began vomiting. Appellant and McCue gave her some milk. She continued vomiting. McCue suggested that appellant get Dr. Dodson.

At approximately 7:00 P.M. the appellant arrived at Dr. Dodson's office. Without apparent anxiety, she said that she thought her baby was dying. Dr. Dodson was in the midst of an examination and suggested that she get Dr. Taylor. She returned to the apartment where McCue was administering artificial respiration to little Terry. He told the appellant to get Dr. Taylor.

Upon descending from her apartment, appellant met Mrs. Gray and advised her, "My baby is sick." Mrs. Gray, mindful of the infant's treatment, asked, "Is your baby sick or did your husband beat the hell out of her?" Appellant protested, "My husband hasn't touched the baby." Appellant used Mrs. Gray's telephone to call Dr. Taylor. She told him the child had a cold, had a lot of phlegm in her throat, and might choke to death. He advised her that he would arrive in about 10 minutes. After appellant returned to her apartment, Mrs. Gray called Dr. Taylor and told him that the child did not have a cold but "that it has been beaten for the last three weeks." The doctor arrived within minutes and found the infant dead.

Appellant made no show of emotion but repeated eight or ten times that McCue could not have done it, and asked if McCue would be all right and what would happen to McCue. The body was taken to the Fire House where resuscitation was attempted. There, Dr. Dodson saw appellant sitting in a police car. She was not crying nor very upset. He asked her why she had allowed the beating to go on. She said there was nothing she could do about it.

Appellant and McCue were taken to the Conowingo Barracks of the State Police. When reunited after separate questioning, they went into a "love scene." The first tear Sgt. Lowe saw appellant shed was after her mother had arrived at the barracks from Oxford.

Dr. Dodson, upon observing Terry's twenty pound body after death, saw that her back and her front, the legs and the buttocks, were covered with bruises and welts. Dr. Taylor described the infant as having multiple bruises from head to foot, both arms, both legs, back, front and face. Dr. Colfer, a pathologist who performed an autopsy upon the child, described the external evidence of injury to be multiple, generalized, red-purple, three-quarter inch diameter discolorations of the skin, irregular in shape. They were on the face, the throat, the left side of the neck, the abdomen, the back and the legs. There was a three-eighth inch diameter tear of the central portion of the upper lip, a three-quarter inch diameter contusion of the inner surface of the left cheek, and a one-quarter inch laceration of the hymen. Human bite marks were on both buttocks. Internally, the autopsy disclosed that all of the abdominal viscera were normal except the liver and the mesentery attachments of the large bowel. There was a "through and through" laceration of the liver. There was a one-inch tear of the "anterior portion, superior and anterior portion, which was in continuity with a similar laceration on the posterior surface of the liver which measured two inches," as well as a laceration of the cauda lobe. There was also a laceration of the mesentery of the colon. In the Doctor's opinion, it would take a "severe" and "violent" force to produce the internal injuries just described.

Both Dr. Colfer and Dr. Dodson thought the external in-

juries and bruises, visible on the body after death, were inflicted within the last two or three days preceding death.

The State does not contend, nor does the evidence establish, that the appellant, herself, ever inflicted any severe or brutal punishment upon little Terry.

McCue admitted that he "probably licked her too much," but blamed this upon business worries and his health. He claimed the incident of August 21st was a lie, and explained the child's black eyes by saying she tripped over an electric fan. He recalled striking the child with his fist on September 3rd. He was lying on the couch with a terrible pain in his leg, and he told the child to pick up her toys and she said, "no"; he told her again and when she again said, "no," he "took a swing." He thought the blow landed about the child's body, and he believed she fell.

The appellant stated, in substance, that the child was, at times, "ornery and stubborn," and she left most of the discipline to McCue; that he was strict, but did not spank Terry hard enough to hurt; that the incident of August 21st did not occur; that she had never seen McCue strike the child with his fist, but had seen him hit her with a belt; that McCue had told her of his biting Terry on the buttocks, but she did not think the punishment too harsh.

She stated that certain incidents arose that required her to leave the apartment quite a number of times on September 3rd. He only spanked the child twice that day, and there was nothing unusual in her appearance or condition. In the afternoon, she brought a doll home to Terry. McCue gave the doll to the infant, who kissed them both and then went to bed. Appellant left the apartment again to obtain some beer for anticipated company. Upon her return, the child was in the bath tub, and, when she inquired of McCue why, he said that Terry was sick and vomiting. She gave the baby warm milk, but Terry could not keep the food down. She had had this difficulty before, and the appellant thought this was a recurrence. The child was having difficulty in breathing, and began spitting up phlegm. McCue told her to go for the doctor and she did. She said she knew of nothing that happened in the apartment that day, except his spankings on the child's

rear; and that she did not, at any time, believe the child's life was in danger, until she went for the doctor. She further stated that she loved Terry and was never unkind to her, and, if she had thought McCue's discipline of Terry too severe, she would have left him.

After a very thorough and careful consideration of the evidence, disclosed by his Memorandum filed in the case, the trial judge concluded that McCue and the defendant were not telling the truth in vital parts of their testimony, but that the State's witnesses did tell the truth. Considering the overwhelming amount of the State's evidence that, in material matters, contradicted McCue and the appellant, and which was adduced from apparently disinterested and unimpeached witnesses, we, most assuredly, cannot say that the judge was "clearly wrong," which would be necessary if we are to reverse his findings of fact. Maryland Rule 741 (c).

The trial judge also concluded that the State had proven beyond a reasonable doubt facts that established gross, or criminal, negligence on the part of the appellant. We think the evidence produced and proper inferences from that evidence were clearly sufficient to support the conclusion. The obligation placed upon a parent by Article 72 A. *supra,* to provide for the care and welfare of a minor is not a perfunctory one, to be performed only at the voluntary pleasure or whimsical desire of the parent. As we stated in the *Craig* case, *supra,* the State is vitally interested in the welfare of its children, although, of course, a reasonable amount of discretion relative to a child's care and welfare is, necessarily, vested in its parents. We do not deem it necessary nor desirable, at this time, to attempt a comprehensive definition of the obligation charged upon a parent by said Section 1, of Article 72 A, *supra,* or to attempt an exact delineation of its boundaries or its scope; but, we will say that we think it clear that the obligation is a real and affirmative one, not to be dealt with lightly. It would serve no useful purpose to repeat the depressing facts in any great detail. We think that the appellant's conduct and actions, in permitting and, in fact, compelling this poor little defenseless urchin to remain in an environment where she was subjected to merciless, inhumane

and inordinate brutality of a protracted nature, manifested a recklessness of justice and the rights and feelings of the tiny infant in such a manner so as to support the finding that the appellant's conduct and actions displayed "a wanton or reckless disregard for human life." The actions of McCue were so outrageous as to put any reasonable person on guard that the child's life was in real and imminent peril. Manifestly, the appellant should, and could, have removed little Terry from the cruelty and danger. Instead of doing so, she, quite to the contrary, affirmatively importuned Mrs. Copenhaver to prevent any such removal. Such conduct, when coupled with the remaining facts of the case, clearly supports the conclusion by the trial judge of gross and criminal negligence on the part of the appellant.

This brings us to a consideration as to whether or not there was a causal connection between the appellant's gross and criminal negligence and the death of the child, for, as we pointed out in the *Craig* case, *supra,* no matter how regrettable the death of the infant, nor how gross and wanton the appellant's negligence may have been, she cannot be held criminally responsible therefor, unless her negligence was a proximate cause of the child's decease.

This Court has stated that the question of proximate cause is usually a question of fact for the determination of the jury, or other trier of the facts. The question of proximate cause here turns largely upon the foreseeability of the consequence of the defendant's permitting McCue to "discipline" the child by repeated and violent beatings. The trial judge, as the trier of the facts in this case, found that there was a causal connection between the mother's negligence and the death. We think the evidence sufficient to sustain his conclusion.

There seems to be no doubt that the direct and immediate cause of Terry's death was the violent blow or blows inflicted upon her by McCue on September 3rd. But we do not deem this action upon his part to amount to an "intervening efficient cause" (as distinguished from one that is concurrent or contributing), as that term is used in the statement of the doctrine of proximate cause. McCue's brutal striking of the child so as to cause her death would constitute a ground of defense

for the appellant's gross negligence only if it were the sole cause of the injury. Cf. *Conowingo Power Co. v. State,* 120 F. 2d 870, 875 (C. A. 4th, Opinion by Parker, J.), and *Holler v. Lowery,* 175 Md. 149, 200 A. 353, both civil cases. In 1 *Wharton, Criminal Law and Procedure* (Anderson), Section 68, the learned author states: "A person is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted. It is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor. It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant. * * * To constitute the cause of the harm, it is not necessary that the defendant's act be the sole reason for the realization of the harm which has been sustained by the victim. The defendant does not cease to be responsible for his otherwise criminal conduct because there were other conditions which contributed to the same result." We pointed out above that McCue's violent and unrestrained actions were of such a nature as to put any ordinary, reasonable person on notice that the child's life was truly and realistically in immediate peril. The appellant easily could, and should, have removed Terry from this danger. Her failure to do so, under the circumstances previously described, is sufficient, as indicated before, to support a finding by the trial judge that her gross and criminal negligence was a contributing cause of Terry's unfortunate death. Cf. *State v. Hecht Company,* 165 Md. 415, 422, 169 A. 311; *Holler v. Lowery, supra,* 175 Md. at page 162; Restatement, *Torts,* Sections 431, 432; *Jubb v. Ford,* 221 Md. 507, 513.

For the reasons stated above, the judgment will be affirmed.

*Judgment affirmed.*