971 A.2d 937

**Eric BURLAS**

v.

**STATE of Maryland.**

**No. 2531, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 12, 2009.

560

Dale A. Cooter (James E. Tompert, Cooter Mangold Tompert & Karas LLP on the brief), Washington, D.C., for appellant.

Mary Anne Ince (Douglas Gansler, Attorney General on the brief), Baltimore, for appellee.

Panel: JAMES R. EYLER, MEREDITH and SHARER, J. FREDERICK (Retired, Specially Assigned), JJ.

SHARER, J.

At approximately 10:00 a.m. on September 21, 2006, while making a left turn across the southbound lanes of Georgia Avenue in Silver Spring, a vehicle operated by Paul Myers

was struck by a vehicle operated by appellant, Eric Burlas. Myers was killed; Burlas was injured, but survived.

Burlas was charged with manslaughter by motor vehicle, reckless driving, and excessive speed. Following a non-jury trial in the Circuit Court for Montgomery County, Burlas was convicted of all three offenses.[1]

In his timely appeal, Burlas makes two assertions:

1.  The evidence was insufficient to convict Burlas of manslaughter by motor vehicle.
2.  The evidence was insufficient to prove that Burlas proximately caused the collision with Myers.

For the reasons that we shall discuss, we shall affirm the judgments of the circuit court.

## FACTUAL BACKGROUND

In his opening brief, Burlas sets out the following statement of facts [2]:

> On September 21, 2006, Burlas was driving southbound on Georgia Avenue [toward] the intersection of Georgia [Avenue] and Emory [Lane]. At the same time, Myers was driving northbound [on Georgia Avenue toward] the same intersection. At trial, [this] intersection was described ... as follows:
>
>> Georgia Avenue is a multi-lane asphalt roadway that ... takes vehicular traffic [toward] Olney in the northbound direction and [toward] Silver Spring in the southbound direction. [At t]he northbound portion of Georgia Avenue in the area of the collision, there is a dedicated left turn lane, two straight ["]through["] lanes[,] and a dedicated right turn lane into the Olney Manor Park.

---

**1.** The reckless driving and speeding convictions were merged into the manslaughter conviction. Burlas was sentenced to a term of incarceration of three years, eighteen months of which was suspended. He was also fined and placed on supervised probation.

**2.** The State "accepts the Statement of Facts set forth in Burlas' [B]rief, as supplemented and modified in [its a]rgument...."

Southbound Georgia Avenue has a dedicated left turn [lane] into the Olney Manor Park[,] three straight lanes[,] and a dedicated right turn lane. The intersection is controlled by automatic traffic signals. There is no dedicated arrow there. Left[-]turning vehicles from northbound Georgia [Avenue] into Emory [Lane] do receive an arrow[,] but the intersection is basically a yield on green once the arrow is gone.

Emory Lane would be to the left of [traffic] traveling northbound[,] and that's a small kind of residential street, with just two lanes.

Myers turned left from northbound Georgia Avenue onto Emory [Lane] at the same time that Burlas was traveling southbound on Georgia Avenue on the north side of Emory [Lane]. The[ir] vehicles collided. Burlas was injured but survived. Myers died at the scene.

We add to Burlas's summary two other important facts. First, the posted speed limit on southbound Georgia Avenue was 50 miles per hour. Second, at the time that the Burlas and Myers vehicles collided, Burlas's vehicle was traveling between 84 and 87 miles per hour. Other nuances and inferences will be revealed as necessary for our discussion.

### The Evidence

The State adduced testimony from five fact witnesses. At trial, the parties disputed whether Myers might have consumed alcohol prior to the collision.[3] Myers's widow, Linda

---

**3.** Pamela Southall, M.D., of the Office of the Medical Examiner, testified that Myers's heart blood had an ethanol level of 0.04%. There was no direct evidence that Myers consumed an alcoholic beverage on the day of his death. Dr. Southall further testified:

It's not uncommon for [a toxicologist] to see ethanol or ... positive ethanol levels in people who have suffered significant internal organ injury, primarily the organs of the gastrointestinal system, which readily contain bacteria and have that ongoing production, and when some of those organs are injured, there can be some seepage of these bacteria and continued production of ethanol by these bacteria. Therefore, it's not uncommon for there to be a positive alcohol level in these cases.

Myers, testified that she did not see her husband consume any alcohol during the night before or morning of the collision. Voula Vithoulkas, with whom Myers had transacted some business a short time before the collision, testified that she did not detect any use of alcohol by Myers.

The State called three witnesses—John Mulcare, Jacques Benjoar, and Scott Basik—all of whom were, to some extent, eyewitnesses to the events just before, at the time of, and just after the collision. Prior to the collision, Mulcare was driving northbound on Georgia Avenue and slowing down for a yellow light at Emory Lane. "Out of [his] left eye," Mulcare saw the Burlas and Myers vehicles collide. Mulcare did not notice the vehicles before the collision, and observed them for a "split second." Immediately after the collision, Mulcare saw that the light for traffic turning left onto Emory Lane, which was Myers's intended path, had changed to red.

Benjoar, at the time of the collision, was stopped in his vehicle on Emory Lane for a red light at its intersection with Georgia Avenue. After hearing, but not seeing, the collision, Benjoar looked up and saw two vehicles "airborne."

Basik testified that while driving southbound on Georgia Avenue, he was passed by a "silver car" that was, in his opinion, traveling "way too fast" and "just flew by [him in] the lefthand lane." Seconds later, Basik arrived at the scene of the collision and saw that a silver car was involved. Basik was uncertain, however, whether the silver car that had passed him was the same silver car involved in the collision. The State did not present any evidence as to the density of traffic or presence of other vehicles, other than the silver car observed by Basik, on either Georgia Avenue or Emory Lane prior to the collision.

The State also called Detective Glenn Day of the Montgomery County Police Department, a vehicular collision reconstruction expert, who testified that the speed limits on Georgia Avenue and Emory Lane are 50 and 30 miles per hour, respectively. Northbound Georgia Avenue runs slightly uphill and, conversely, southbound Georgia Avenue runs slightly

downhill. The topography results in a slight crest of the hill near the intersection of Georgia Avenue and Emory Lane. The detective explained:

[T]here is some limited sight distance there, due to the contour and elevation of the land or roadway.

. . .

... Myers ... would have been looking uphill, up[-]grade[,] and there is the crest of a hill [there] that you wouldn't be able to see over into oncoming traffic southbound.[4]

There was little, if any, dispute as to the speed of Burlas's vehicle at the time of the collision. Burlas's collision reconstruction expert, Robert Squire, opined that Burlas was traveling at 84 to 86 miles per hour at the time of the collision. Detective Day estimated Burlas's speed at that time to be "85 or 87" miles per hour. The detective opined that, had Burlas been driving at the speed limit, Myers would have safely cleared the intersection.

### The Verdict

Following the presentation of evidence and arguments of counsel, the trial court rendered the following verdict:

Well, there seems to be no disagreement between counsel that the fundamental factor in this matter is speed and I'm going to address that issue along with the others in this case.

This accident occurred on a public roadway that is not a highway. There was intersecting traffic as incidents a light controlled intersection, a suburban area with a posted speed limit of 50 miles per hour. Near where this incident occurred, there was a bus stop and also this occurred midmorning, late morning on a regular work day. It's not uncommon in instances such as this for several factors to work together, a high speed chase, alcohol, erratic vehicular

---

4. At trial, Burlas suggested that Myers hurried through the intersection on a yellow, if not red, light and, because of the crest of the hill, could not see Burlas approaching. According to Detective Day, however, Burlas was also faced with a limited view as he drove southbound.

movement, weather, lighting conditions, and so forth and so on.

As I indicated, it's a 50–mile–per–hour posted speed limit in this case. We've heard some expert testimony with respect to accident reconstruction, theoretical responses to theoretical questions, but it appears that there is no fundamental disagreement with respect to the vehicle in question in this case. At minimum, it was exceeding the posted speed limit by 34 miles per hour. Ordinarily, one factor is not sufficient, however, under these circumstances, the speed was in the extreme and one factor in the extreme may be sufficient.

There was one witness in this matter who testified that upon the occurrence of the incident, that the vehicle operated by the decedent in this case was airborne. Another lay witness whose car was passed on the left by a silver vehicle commented to himself at the time of the observation, when he was passed, that the subject vehicle was going way too fast, and of course, he came up on the scene a few moments later.

If there are multiple factors, they may act together to produce an unfortunate result. I have to be satisfied beyond a reasonable doubt that the conduct was grossly negligent, wanton, and reckless in connection with the public, both the motoring public and the pedestrian public. Pedestrians don't walk on highways but they often walk on roadways.

There's also been the issue addressed about the movement of the vehicle of the decedent. The [c]ourt does not consider that to be a substantial factor.

Based on the entire record in this case, I am persuaded beyond a reasonable doubt that the defendant is guilty of the offense of vehicular manslaughter. I find him guilty. That also includes the lesser included offenses of speed as well as [reckless] driving.

## STANDARD of REVIEW

Our review of a case tried non-jury is governed by Rule 8–131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

■■■ The standard for our review of the sufficiency of the evidence to support a criminal conviction is whether, on the evidence presented, taken in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citation omitted). The fact-finder "possesses the ability to 'choose among differing inferences that might possibly be made from a factual situation,'" and the appellate court "must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." *State v. Suddith*, 379 Md. 425, 430, 842 A.2d 716 (2004) (citations and footnote omitted).

■■■ Nonetheless,

> [a]n assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law. This is an area wherein the reviewing court is not at all deferential to the trial court. It makes the same determination on the same basis as does the trial court. In assessing legal sufficiency, we will look only at that which was formally received in evidence.

*Polk v. State*, 183 Md.App. 299, 306, 961 A.2d 603 (2008).

The Court of Appeals has said that the concern of the appellate court

is not whether the verdict below was in accord with the weight of the evidence, but rather, whether there was sufficient evidence at trial "that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998) (quoting *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336 (1994)).

In our review, we also recognize that there is no distinction to be given to the weight of circumstantial, as opposed to direct, evidence. A conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence. As we stated in *Nichols v. State,* 5 Md.App. 340, 247 A.2d 722 (1968):

> The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused.

*Id.* at 350, 247 A.2d 722.

## DISCUSSION

### 1. *Sufficiency of the Evidence*

Manslaughter by vehicle is a statutory offense. Maryland Code (2002, 2005 Supp.), § 2–209(b) of the Criminal Law Article ("CL") provides: "A person may not cause the death of another as a result of the person's driving, operating, or controlling a vehicle ... in a grossly negligent manner." CL § 2–209(a) includes a motor vehicle within the statutory definition of "vehicle."

In this case, as in nearly every case of manslaughter by vehicle, the question is whether Burlas's conduct amounted to gross negligence. In the context of manslaughter by vehicle, "gross negligence" has been defined as " 'a wanton or

reckless disregard for human life.' " *Skidmore v. State,* 166 Md.App. 82, 86, 887 A.2d 92 (2005) (quoting *State v. Kramer,* 318 Md. 576, 590, 569 A.2d 674 (1990)) (citation omitted). Maryland cases, which we shall discuss, have suggested that excessive speed alone does not constitute gross negligence; hence, more is required to prove manslaughter by vehicle beyond a reasonable doubt. Excessive speed under certain circumstances, however, may be sufficient to establish the offense.

We reiterate that the underpinning of a conviction of manslaughter by motor vehicle is the "grossly negligent" operation of the vehicle. CL § 2–209. Grossly negligent operation of a vehicle is defined as conduct that shows a "wanton or reckless disregard for human life." *Skidmore, supra,* 166 Md.App. at 86, 887 A.2d 92. Simple negligence is insufficient to support a conviction for manslaughter by vehicle. *Kramer, supra,* 318 Md. at 590, 569 A.2d 674. As we explained in *Boyd v. State,* 22 Md.App. 539, 323 A.2d 684 (1974):

> It is abundantly clear from the cases that the General Assembly of Maryland imported into the [Maryland] Code the common law concept and meaning of gross negligence. Proof of simple negligence will not support a conviction of manslaughter. Whether the statutory standard "in a grossly negligent manner" has been violated depends upon "whether the conduct of the defendant, *considering all the factors of the case,* was such that it amounted to a 'wanton or reckless disregard for human life.' "

*Id.* at 550, 323 A.2d 684 (quoting *Maryland v. Chapman,* 101 F.Supp. 335, 341 (D.Md.1951) (emphasis added)) (footnote omitted).

Only infrequently have the appellate courts of Maryland been called upon to consider whether conduct was grossly negligent in the context of a prosecution for manslaughter by vehicle, and therefore rose to the level of wanton or reckless disregard for human life. Our review has led us to several

Maryland cases in which excessive speed was the overriding evidentiary factor.

In *Duren v. State*, 203 Md. 584, 102 A.2d 277 (1954),

> [t]he State produced testimony at ... trial which showed that [Duren] was driving [an] automobile ... on Fremont Avenue in ... Baltimore at a speed estimated by an experienced driver to have been at least [60] miles an hour.... As [Duren] approached the intersection of Fremont Avenue and Laurens Street, a heavily congested residential and business area, the man who was killed walked ... into the street from between [two parked] cars [and] was struck by the right front bumper of [Duren's] car.... The investigating police officer found four skid marks, admittedly made by the tires of [Duren's] car, [of] a distance of [144] feet.

*Id.* at 588–89, 102 A.2d 277. Convicted of manslaughter by automobile, Duren appealed on the ground that the evidence was insufficient to sustain his conviction. *Id.* at 587, 102 A.2d 277.

The Court of Appeals first gave a historical perspective to its opinion:

> Long before automobiles ... the courts held that allowing a horse drawn vehicle to proceed at an excessive or immoderate speed could constitute criminal negligence in a given environment. [In *Rex v. Walker*, 1 Carrington & Payne 191 (1824),] the defendant was driving a cart with two horses which were cantering. The pedestrian who was struck was drunk and could not get out of the way because of that fact and the rapid pace of the horses. The Court, in its charge, laid down the following: "That if a man drive a cart at an unusually rapid pace, whereby a person is killed, though he called repeatedly to such person to get out of the way; if from the rapidity of the driving, or any other cause, the person cannot get out of the way [in] time enough, but is killed, the driver is in law guilty of manslaughter[.]" [In *Rex v. Timmons*, 7 Carrington & Payne 728 (1836), t]he accused was driving an omnibus which was racing with another. The charge to the jury was that they must be

satisfied: "... that the prisoner was driving in such a negligent manner that by reason of his gross negligence, he had lost command of his horses[.]"

It is plain that the environment in which speed is indulged must determine whether it does or does not show gross negligence at a given time. Speed in the open country on a four lane highway may be very high and not constitute negligence. A much lower rate of speed in a city street may constitute gross negligence. This, too, was the law long before automobiles existed.

*Duren,* 203 Md. at 590–91, 102 A.2d 277 (citations omitted).

Discussing the extent to which speed may serve as the basis for a conviction of manslaughter by vehicle, the Court stated:

Obviously, what must be looked for in each case is whether, by reason of the speed in the environment, there was a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another. If there is found such lack of control, whether by reason of speed or otherwise, in a place and at a time when there is constant potentiality of injury as a result, there can be found a wanton and reckless disregard of the rights and lives of others and so, criminal indifference to consequences.

Since speed may constitute negligence in one situation and not in another, there are cases which have held that speed alone will not support a conviction of manslaughter. However, even those Courts which have so decided have upheld manslaughter convictions [where] speed, under the circumstances in which it was found, was evidence of reckless disregard for life.

*Id.* at 592, 102 A.2d 277 (citations omitted).

Affirming Duren's conviction, the Court

[could not] say that the trial court was clearly wrong when it found that [Duren] was driving on a city street at a speed so grossly excessive that his car was beyond effective control and that this conduct, under the circumstances, amounted to a disregard of the consequences which might ensue

and indifference to the rights of others, and so was a wanton and reckless disregard for human life.

*Id.* at 590, 102 A.2d 277.

The Court revisited the subject in *Thomas v. State*, 206 Md. 49, 109 A.2d 909 (1954). On the day of the accident which gave rise to his case, Thomas, a beer truck driver, "consumed six bottles of beer, . . . two of which were consumed just a few minutes before the . . . accident. . . ." *Id.* at 52, 109 A.2d 909. At the time of the accident, Thomas was driving a truck whose "brakes were . . . not functioning properly. . . ." *Id.* at 53, 109 A.2d 909. As Thomas was traveling at "approximately [30] or possibly [35] miles an hour," his brakes malfunctioned and his truck swung back and forth across the roadway. *Id.* at 53–4, 109 A.2d 909. "[D]uring these swings[, Thomas did] not appl[y] the brakes, as he was afraid [that] it would upset the truck." *Id.* at 54, 109 A.2d 909. After maneuvering the truck onto a bridge, Thomas struck two children who had been walking across it, both of whom "died as a result of their injuries." *Id.* After being convicted of two counts of manslaughter by automobile,[5] Thomas appealed on the ground that the evidence was insufficient to sustain his conviction. *Id.* at 51–2, 109 A.2d 909.

There being "no substantial conflict in the evidence," the Court found "three factors from which gross negligence might be deduced: (1) excessive speed; (2) defective brakes; and (3) intoxication." *Id.* at 52, 55, 109 A.2d 909. As to whether Thomas's speed at the time of the accident was excessive, the Court stated:

[T]he evidence is not clear that the speed limit was being exceeded at all as [Thomas's] truck reached the top of the hill and curve leading to the scene of the fatalities. If it was exceeded, it was not greatly exceeded, and there seems to

5. Initially tried in the Trial Magistrate's Court, Thomas was acquitted. The State appealed to the circuit court. For a discussion of the State's right to appeal a "not guilty" verdict rendered in a Trial Magistrate's court, see *State v. Campbell and Reeves*, 7 Md.App. 538, 256 A.2d 537 (1969).

be no contradiction of the testimony showing that [Thomas] was driving the truck over a familiar route and at his usual speed and that he had previously encountered no difficulty while doing so. [The trial judge] did not . . . find [Thomas's speed] such as to indicate gross negligence. Neither do we.

*Id.* at 55–56, 109 A.2d 909. Additionally holding that neither the operation of the truck with defective brakes nor the level of Thomas's intoxication was sufficient to warrant a finding of gross negligence, the Court reversed Thomas's conviction.[6] *Id.* at 56–58, 109 A.2d 909.

In *Lilly v. State,* 212 Md. 436, 129 A.2d 839 (1957), the Court examined whether a combination of excessive speed and alcohol constituted gross negligence. Lilly drove his automobile through a stop sign and collided with a bus, killing his passenger. *Id.* at 438, 129 A.2d 839. A passenger on the bus, who "had been a chauffeur for about fifteen years[,] estimated that the speed of [Lilly's] car [at the time that it struck the bus was] between 50 and 60 miles per hour. . . ." *Id.* at 440–41, 129 A.2d 839. Although a "blood test showed that there was not sufficient alcohol in [Lilly's] blood stream to prove that he was intoxicated," and the State "was not contending [that Lilly] was operating [his vehicle] under the influence of liquor[,]" Lilly conceded that he had consumed alcohol before the collision. *Id.* at 439–40, 443, 129 A.2d 839. Following his conviction for manslaughter by automobile, Lilly appealed on the ground that the evidence was not sufficient to sustain the conviction. *Id.* at 438, 441, 129 A.2d 839. Citing *Duren, supra,* the Court affirmed Lilly's conviction, concluding that

[t]here was ample evidence from which the trial judge could find that [Lilly], who had been drinking, drove his automobile in the City through a stop sign at excessive speed and crashed into the bus which was on the through street, resulting in the death of his passenger, and that these

---

6. After concluding that the evidence was insufficient, the Court observed: "The remand will not preclude a new trial, if the State elects to retry the charges." *Thomas,* 206 Md. at 58, 109 A.2d 909.

actions amounted to a wanton and reckless disregard for human life, and constituted manslaughter by automobile. *Lilly,* 212 Md. at 444–45, 129 A.2d 839.

In *Johnson v. State,* 213 Md. 527, 132 A.2d 853 (1957), "[t]he controlling question presented [was] whether or not[,] on the evidence submitted, the trial court was clearly in error in finding [Johnson] guilty of [manslaughter by automobile]." *Id.* at 531, 132 A.2d 853 (citations omitted). The Court responded:

> [T]he answer to that question depends upon whether or not, *in the circumstances existing at the time and place of the accident,* [Johnson] was operating the automobile at such an excessive rate of speed as to constitute gross negligence. . . .

*Id.* (emphasis added). After reviewing the record, which contained conflicting testimony as to the speed of Johnson's car—estimates ranged from 35 to 60 miles per hour—the Court found the evidence to be insufficient to sustain Johnson's conviction, and reversed. *Id.* at 530, 532–34, 132 A.2d 853. Significant to our inquiry, the Court did not hold that speed alone is not sufficient to support a conviction. Instead, the Court held that Johnson's speed did not rise to the level of gross negligence. *Id.* at 534, 132 A.2d 853.

In *Kramer, supra,* the Court was again asked to "review the sufficiency of the evidence to sustain [a] conviction of manslaughter by automobile." 318 Md. at 586, 569 A.2d 674. On "a two-lane road in a rural environment[,]" and while attempting to pass a vehicle in a no-passing zone at approximately 75 miles per hour in a 55 miles-per-hour zone, Kramer's vehicle struck a third vehicle that had swerved off the road in an attempt to avoid a collision with Kramer's vehicle. *Id.* at 587–89, 569 A.2d 674. One of the passengers in the vehicle struck by Kramer's vehicle was killed. *Id.* at 587, 569 A.2d 674. After reviewing the evidence, the court concluded:

> It is true that, *ordinarily,* speed alone may not be a sufficiently negligent act to support an inference of criminal intent. It is also true that here the speeding was in a rural environment. Regardless, considering the nature of the

road, it is apparent, in the language of *Duren*, that the evidence was sufficient for the jury to find that "by reason of the speed in the environment, there was a lessening of the control of [Kramer's] vehicle to the point where such lack of effective control [was] likely at any moment to bring harm to another." [7] And, we believe it to be clear, that, the jury, weighing the speed in the light of the surrounding circumstances, could, again in the words of *Duren*, have found "such a lack of control, whether by reason of speed or otherwise, in a place and at a time when there [was] constant potentiality of injury as a result...."

*Kramer*, 318 Md. at 592, 569 A.2d 674 (quoting *Duren, supra,* 203 Md. at 592, 102 A.2d 277) (emphasis added).[8] *See also Taylor v. State,* 83 Md.App. 399, 404, 574 A.2d 928 (1990) ("Speed, erratic driving, disregard of [a] red light, force of impact—all of these can be taken as evidence of wanton or reckless disregard of human life." (citations omitted)).[9]

The Court has consistently followed the standard set in *Duren, supra,* and so shall we. The greatly excessive speed of Burlas's vehicle was conceded at trial. In our view, the circumstances in which that speed was attained amounts to sufficient evidence to support the trial court's verdict. As in *Kramer*, it is clear that, because of his great speed, Burlas failed to keep his vehicle under control. It is equally clear, from the absence of pre-collision skid marks, that Burlas was unaware of the presence of Myers's vehicle at the intersection where the two collided. The impact of the colliding vehicles, as described by eyewitnesses, was so great that it caused the "cars to be airborne." It may be clearly inferred, moreover,

---

7.  The speed of Kramer's vehicle was estimated at approximately 75 miles per hour in a 55 miles per hour zone. *Kramer,* 318 Md. at 589, 569 A.2d 674.

8.  The Court reversed Kramer's conviction on other grounds. *Kramer,* 318 Md. at 585, 569 A.2d 674.

9.  We reversed Taylor's conviction because the trial court erred in permitting the State to *nol pros* lesser included offenses before his case went to the jury. *Taylor,* 83 Md.App. at 400-1, 574 A.2d 928.

that Burlas failed to keep a sufficient lookout in the operation of his vehicle.

The nature of the area in which the collision occurred is also significant. Driving at a speed of 84 to 87 miles per hour on an interstate or other controlled access highway,[10] although illegal, does not necessarily amount to negligence. However, the Burlas and Myers vehicles collided in what is essentially a residential area. While it is true that Georgia Avenue is divided and multi-laned, it is a busy highway in a populated residential area. Indeed, the extensive aerial photographs of the area introduced by the State clearly show that the area to the west of Georgia Avenue is residential, and the area to the east consists of park and recreational facilities. Georgia Avenue and Emory Lane are intersecting roadways intended for both vehicular and pedestrian use.[11]

In sum, we hold that the evidence of Burlas's operation of his vehicle at a greatly excessive speed, under the circumstances that have been described, was sufficient for the trial judge to have found that Burlas acted with a wanton and reckless disregard for human life. Hence, a rational trier of fact could have reasonably found that Burlas was grossly negligent, and the evidence was sufficient to convict him of manslaughter by motor vehicle.

### 2. *Proximate Cause*

Burlas also contends that "the State ... failed to sufficiently prove proximate cause because of the intervening

---

**10.** Md.Code (1977, 2008 Repl.Vol.), § 8–101 of the Transportation Article defines "controlled access highway" as "a major highway with the same characteristics as an expressway, except that the conflict of cross streams of traffic is not eliminated necessarily at each intersection by grade separation structures." § 8–101 defines "expressway" as "a major highway of two or more traffic lanes in each direction that is designed to eliminate principal traffic hazards and has ... [p]oints of entrance and exit limited to predetermined locations...."

**11.** The evidence also revealed that, after the collision, but before the vehicles came to rest, Burlas's vehicle struck a newspaper dispenser box at a bus stop shelter. There was no one waiting at the bus stop at the time.

actions of Myers." He essentially makes two arguments: that Myers's vehicle had recently failed a motor vehicle inspection, and that Myers contributed to the collision by failing to yield the right-of-way to the favored highway. We are not persuaded by either of these arguments.

The fact that Myers's vehicle did not pass an inspection adds nothing to the question of causation. There is no evidence as to the reason for the inspection failure. Moreover, there is no evidence that any defect in Myers's vehicle contributed to the collision. Burlas's assertion that "[t]he uncertainty regarding the condition of Myers' car creates a cloud of uncertainty regarding the proximate cause of the accident[,]" on this record, amounts to no more than rank speculation.

Burlas also argues that "it is likely" that Myers had "sped up to try to make his left turn onto Emory [Lane] before [his] light turned red." [12] Assuming, *arguendo*, the accuracy of that statement, it is equally clear that Myers, even if proceeding on a yellow light, had the right to do so, and did not have to anticipate the approach of an oncoming vehicle traveling at a speed 35 miles per hour above the posted limit. "It has always been the law that a pedestrian or a vehicle starting across an intersection with a favorable signal has the right to complete the trip, even if the light changes in the middle of the passage." *Caryl v. Baltimore Transit Co.*, 190 Md. 162, 168, 58 A.2d 239 (1948) (citation omitted).

It is true that a defendant

" . . . is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted. [But, t]he defendant does not cease to be responsible for his otherwise criminal conduct because there were other conditions which contributed to the same result."

---

**12.** Burlas's stepmother, Virginia Burlas, testified, over objection, that three days after the collision, Burlas said to her, "I can't believe he pulled out in front of me . . . ."

*Palmer v. State,* 223 Md. 341, 353, 164 A.2d 467 (1960) (quoting 1 Wharton, *Criminal Law and Procedure* § 68 (Anderson)).

Relying on *Pagotto v. State,* 127 Md.App. 271, 732 A.2d 920 (1999), *aff'd,* 361 Md. 528, 762 A.2d 97 (2000), in support of his argument that Myers's conduct was an independent intervening act which caused the collision, Burlas asserts that when a defendant generates evidence of potential lack of proximate cause, the burden then shifts to the State to disprove the point. We are not persuaded. "[T]he question of proximate cause is usually a question of fact for the determination of the jury, or other trier of the facts." *Palmer, supra,* 223 Md. at 352, 164 A.2d 467. The issue was argued to the trial court, whose verdict inferentially reflects a rejection of the notion.

The evidence before the trial court did not support a finding that Myers's operation of his vehicle contributed to the collision. It does not follow that the trial court, sitting without a jury, having heard the evidence of both the State and Burlas, and having adopted one as opposed to the other, has erred. "We would note that it is nearly impossible for a verdict to be clearly erroneous or an abuse of discretion or legally in error when it is based not on a fact finder's being persuaded of something but only on the fact finder's being unpersuaded." *Byers v. State,* 184 Md.App. 499, 531, 966 A.2d 982 (2009).

We affirm the judgments of the circuit court.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS ASSESSED TO APPELLANT.**